Gary L. PENICK, et al., Plaintiffs,

v.

COLUMBUS BOARD OF EDUCATION, et al., Defendants.

No. C-2-73-248.

United States District Court, S. D. Ohio, E. D.

Jan. 8, 1981.

Richard M. Stein, Leo P. Ross, Columbus, Ohio, Teresa Demchak, NAACP, New York City, for plaintiffs.

Samuel H. Porter, Curtis A. Loveland, Thomas P. Michael, Columbus, Ohio, Mark O'Neill, Cleveland, Ohio, for defendants.

## OPINION AND ORDER

DUNCAN, District Judge.

### Introduction

In an earlier opinion in this case, this Court concluded that the Ohio State Board of Education and the Ohio Superintendent of Public Instruction—the State defendants—in addition to the Columbus defendants violated the constitutional rights of certain Columbus school children. *Penick v. Columbus Board of Education*, 429 F.Supp. 229 (S.D.Ohio 1977). That conclusion was grounded, for the most part, on the belief that the State defendants failed to act when action was required. I wrote:

> The failure of these State defendants to act, with full knowledge of the results of such failure, provides a factual basis for the inference that they intended to accept the Columbus defendants' acts, and thus shared their intent to segregate in violation of a constitutional duty to do otherwise.

Upon appellate review, the United States Court of Appeals for the Sixth Circuit, although regarding my conclusion "as a general finding of intentional support of segregation by the State Board," returned the case to this Court, ruling that the question of the liability of the State defendants should be further considered. *Penick v. Columbus Board of Education*, 583 F.2d 787, 818 (6th Cir. 1978).

The United States Supreme Court, in reviewing this case, concisely summarized this Court's findings and conclusions against the Columbus defendants, as follows:

> Third, the District Court not only found that the [Columbus School] Board had breached its constitutional duty by failing effectively to eliminate the continuing consequences of its intentional systemwide segregation in 1954, but also found that in the intervening years there had been a series of Board actions and practices that could not "reasonably be explained without reference to racial concerns," *id.* at 241, and that "intentionally aggravated, rather than alleviated," racial separation in the schools. App. to Pet. for Cert. 94. These matters included the general practice of assigning black teachers only to those schools with substantial black student populations, a practice that was terminated only in 1974 as the result of a conciliation agreement with the Ohio Civil Rights Commission; the intentionally segregative use of optional attendance zones, discontiguous attendance areas, and boundary changes; and the selection of sites for new school construction that had the foreseeable and anticipated effect of maintaining the racial separation of the schools. The court generally noted that "[s]ince the 1954 *Brown* decision, the Columbus defendants or their predecessors were adequately put on notice of the fact that action was required to correct and to prevent the increase in" segregation, yet failed to heed their duty to alleviate racial separation in the schools. 429 F.Supp., at 255.

*Columbus Board of Education v. Penick*, 443 U.S. 449, 461–63, 99 S.Ct. 2941, 2948, 61 L.Ed.2d 666 (1979) (footnotes omitted).

The question for this Court to decide on remand is whether the State defendants have intentionally acted or failed to act thereby causing systemwide school segregation in the Columbus School District. This question requires inquiry into the relationship, if any, of the State defendants to the discriminatory practices of the Columbus defendants, noted above, such as the general assignment of black teachers only to those schools with substantial black student populations; the intentionally segregative use of optional attendance zones, discontiguous attendance areas and boundary changes; the selection of sites for new school construction that had the foreseeable and anticipated effect of maintaining racial separation; the failure to heed the duty to

alleviate continuing consequences of intentional systemwide segregation in the schools after adequate notice that action was required; and other intentional acts or omissions. Part of the Court's task on remand, therefore, is to review the facts and arrive at conclusions concerning the involvement, if any, of the State defendants in these acts or omissions. In determining this question, it is critical to determine just how much involvement by the State is needed to establish liability. In this connection, the Court of Appeals set forth certain guidelines to help in this determination. The Court of Appeals stated:

> While we believe that what we have quoted from the District Judge's opinion must be regarded as a general finding of intentional support of segregation by the State Board, it may well be argued that the *Dayton [Bd. of Educ. v. Brinkman,* 433 U.S. 407, 97 S.Ct. 2766, 53 L.Ed.2d 851] opinion requires more detailed findings of fact pertaining to (1) the State Board's knowledge (if any) of the Columbus Board's intentional segregative practices, (2) the State Board's failure to protest or restrain them by withholding funds, (3) the State Board's continuance of support in the face of such knowledge, (4) the motivation of the State Board in failing to investigate the reasons for de facto segregation, and (5) the effect of findings if any, under (1), (2), (3) and (4) above as suggested in *Dayton, supra,* [433 U.S.] at 420 [97 S.Ct. at 2775] . . . .

*Penick v. Columbus Board of Education,* 583 F.2d 787, 818 (6th Cir. 1978).

The Court of Appeals suggested the taking of additional testimony concerning the factual issues. This has been done.

■ Plaintiffs cite *Ex parte Virginia,* 100 U.S. 339, 25 L.Ed. 676 (1880) and *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) in support of their contention that the State of Ohio, although not a party to this action, is nevertheless liable for the acts of its political subdivisions. Thus, they say, the State of Ohio is before the Court in the person of parties who have the power to provide a remedy, and whose predecessors have caused the wrong.

Certainly, insofar as the contention speaks to the necessity of having the state or other of its divisions as parties before the Court for the purpose of assuring that the constitutional violations found against the Columbus defendants are remedied, the Court sees merit in the position. To date, however, the Court has not found it necessary to add parties for that purpose. To the extent that the argument calls for a conclusion of constitutional violations on the part of the State of Ohio or any of the State defendants without a finding that they or either of them have acted or failed to act with intent to cause or maintain unlawful segregation in the Columbus schools, it must be rejected. To hold otherwise would be contrary to the direction the Court of Appeals has suggested this Court follow on remand.

There is no basis for a theory of derivative or indirect liability. See *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *United States v. Board of School Commissioners of City of Indianapolis,* 573 F.2d 400 (7th Cir. 1978). As the Supreme Court stated in *Monell v. New York City Department of Social Services,* 436 U.S. 658, 694, n.58, 98 S.Ct. 2018, 2037, n.58, 56 L.Ed.2d 611 "[b]y our decision in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) we would appear to have decided that the mere right to control without any control or direction to supervise is not enough to support § 1983 liability."

■ If, on the other hand, a superior fails to perform an explicit statutory duty and constitutional injury occurs, liability may attach. In *Johnson v. Duffy,* 588 F.2d 740, 743–44 (9th Cir. 1978), Judge Hufstedler stated as follows:

> Section 1983 provides, in pertinent part, that "[e]very person who, under color of any statute of any state . . ., sub-

jects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ..." (42 U.S.C. § 1983.) A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made. (*Sims v. Adams* (5th Cir. 1976) 537 F.2d 829.) Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable.

■ The State defendants can be held liable if, through custom or practice, unlawful acts of subordinates are intentionally condoned by inaction when a foreseeable consequence of such inaction is an intrusion on constitutional rights and the inaction is a proximate cause of the injustice. As noted in an earlier opinion in this case, there is no requirement that the defendants be shown to have acted with racial animus.

In remanding the case for further proceedings, the Court of Appeals remarked:

The record does not show an act on the part of the State Board which *required* the Columbus Board to pursue the segregative policies which the District Judge and this Court have found. It also does not show any action that the State Board took affirmatively to desegregate the Columbus schools or even to use its statutory powers to investigate and make findings as to whether the Columbus schools were being operated within the law.

*Penick v. Columbus Board of Education,* *supra,* 583 F.2d at 818.

This description of the state of the record remains correct even after the taking of additional evidence on remand. There is no evidence that the State Board required the violations. On the other hand there certainly is no evidence that the State Board took affirmative action to remedy the segregation or used its statutory powers to investigate. What the record indicates is a "studied indifference" entertained by State Board officials which can be reasonably said to have had the foreseeable effect of perpetuating unlawful practices in Columbus schools. The Court believes there is sufficient evidence as outlined below to establish liability in the State defendants for the constitutional deprivation imposed upon the plaintiffs in this case. The Court's findings in this regard are set forth below.

### Historical Background

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977), the Supreme Court enumerated evidentiary sources a court can look to in determining the motivation for official action or inaction. Among these are the disproportionate impact of official action and the historical background including sequential events leading to a particular decision, any departures from normal policy and practice, and legislative or administrative history through statements of members of the decision-making body, minutes of its meetings or reports. *Id.* at 266–68, 97 S.Ct. at 563–65.

Accordingly, the Court's factfinding begins with historical facts concerning race and public education in Ohio, the State Board, the State Superintendent, and their predecessors in some detail.

Ohio became a state in 1803. The 1851 Ohio Constitution specifically denied the right to vote to blacks. Prior to 1848 black children in Ohio were denied the opportunity for public education. By an act of February 24, 1848 (2 Curwen Rev.Stat. 1428), Ohio for the first time provided for the education of "colored" children, and directed a tax levy for that purpose upon the property of "colored" persons. This law was replaced by another identical in substance by an act of February 10, 1849, (2 Curwen Rev.Stat. 1465). That law was then "liberalized" by an act of March 14, 1853, which permitted funding for the edu-

cation of black children to derive from the common school fund, but still provided for separate schools for "colored" children. *Van Camp v. Board of Education of Logan,* 9 Ohio St. 406 (1859).

The Supreme Court of Ohio in 1871 commented on the issue of *separate* schools as follows:

> It would seem, then, that under the constitution and laws of this State, the right to classify the youth of the state for school purposes, on the basis of color, and to assign them to separate schools for education, both upon well recognized legal principles and the repeated adjudications of this court, is too firmly established to be now judicially disturbed.

*State, ex rel. Garnes v. McCann,* 21 Ohio St. 198, 208 (1871).

By 1887 the statute empowering local boards of education to maintain separate schools was repealed, Act of February 22, 1887 (84 Ohio L. 34) and the Supreme Court of Ohio ruled in *Board of Education v. State,* 45 Ohio St. 555 (1888), that "separate schools for colored children have been abolished."

The Department of Education came into existence in 1837. In 1838 the General Assembly created the office "Superintendent of Common Schools." However, this office was abolished in 1840 and the duties of the office were lodged with the Secretary of State. In 1853 the office of "State Commissioner of Common Schools" was created.

The current State Board of Education did not come into existence until after a 1953 amendment of the Ohio Constitution permitted the General Assembly to enact enabling legislation. Ohio Const., Art. VI, § 4; Title 33, Ohio Revised Code. The State Board had its first meeting in January 1956. The current State Board and the Superintendent of Public Instruction may fairly be identified as successors to the former State Department of Education and the series of officials in the Governor's cabinet who headed the department.

The Superintendent of Public Instruction is appointed by the Board and acts as its secretary and chief executive officer. He also heads the Department of Education, which is the administrative agency through which the Board's policies are implemented. The powers and responsibilities of the Superintendent are defined in R.C. 3301.09 through 3301.12.

This Court found earlier that, notwithstanding the abolition of statutory authority for separate schools for black children, the Columbus Board continued to establish new schools that were separate on the basis of race. For example, in 1909 the Columbus Board of Education created the Champion Avenue School as a separate school for blacks, staffed with black teachers. *Penick v. Board of Education, supra,* 429 F.Supp. at 235.

The predecessors of the current State defendants had ample knowledge of the maintenance and establishment of separate schools, in Columbus as well as elsewhere in the state, by virtue of reports required to be made by local school districts to the state department. According to a number of records kept by the predecessors of the State defendants, substantial numbers of black students attended schools classified as racially separate schools during the 1920's, 1930's, 1940's and 1950's. (State Remand Exhibits 1–6.)

A 1929–31 report from the Ohio Director of Education to the Governor recited that over 64,000 colored children, more than 56,000 of them located in cities, were enrolled in the public schools of Ohio; 1,269 children in Columbus and 1,318 children in Cleveland were enrolled in "special schools for colored children" (State Remand Exhibits 1–6). Subsequent biennial reports are inconsistent as to the extent of segregation. The 1933–35 report recited that "Ohio generally does not have separate schools for colored children. A few cities maintain separate schools for colored pupils." The 1935–37 report states that: "A few cities have separate schools for colored children in certain sections where the population is entirely colored." The 1939–41 report does not reflect the number of colored children but states:

> Ohio has very few separate schools for colored children. Ten cities reported the

existence of separate schools for colored children. These schools are located in centers where the population is mostly comprised of colored people. The following cities reported separate schools—Cincinnati, Chillicothe, Columbus, Dayton, Gallipolis, Lockland, Mansfield (classes only), Middletown, Portsmouth, Wilmington, and Xenia. Cincinnati and Columbus have a separate Junior High School for children in one locality, as well as elementary schools for colored children.

Similarly during the period 1940–1955, the State Department of Education required statistical reports from local school districts. Each district was asked to report the "Number of Separate Schools for Negroes" or, as in later reports, the "Number of Separate Schools for Colored Children." The State Department of Education also required the submission of statistics concerning the number of colored teachers and pupils in each school. In 1940 Columbus reported the operation of four separate elementary schools and one separate junior high for colored children. In each year from 1944–1950 Columbus reported five elementary schools and one junior high; in 1952–1954, four separate elementary schools and one junior high were reported.

There is no doubt that during the reporting years mentioned above until 1954, the State defendants' predecessors were aware that there were a number of "separate schools" for black children in Ohio and in Columbus.

In that year, the United States Supreme Court issued its decision in *Brown v. Board of Education ("Brown I")*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), declaring unconstitutional the maintenance of separate schools for black and white children. The State Department of Education eliminated questions pertaining to race from these statistical reports. No such questions appear on reports until 1968.

### The Powers and Duties of the State Board

The powers and duties of the State Board and Superintendent are set forth in Chapter 3301 of the Revised Code of Ohio and are extensive. The State Board is empowered by R.C. 3301.07 to exercise general supervision of the system of public education in Ohio. That statute enumerates certain powers granted the Board and provides those powers are "in addition to the powers otherwise imposed on the state board under provisions of law."

Among its enumerated powers, the Board exercises "policy forming, planning and evaluative functions for the public schools of the State," "leadership in the improvement of public education in Ohio," and "administ[ration of] the educational policies of this state relating to public schools . . . ." The Board is further required to "prepare and submit annually to the governor and general assembly a report on the status, needs and major problems of the public schools of the state of Ohio, with recommendations for necessary legislative action." R.C. 3301.07(F).

The Board must formulate and prescribe minimum standards for such matters as curriculum, teacher certification, instructional materials, school administration "and such other factors as the board finds necessary," R.C. 3301.07(D). Since 1966 the State Department of Education has made periodic inspections of various school districts to review compliance with certain legal minimum standards. School facilities are on-site inspected. The student population, teacher population, and physical plant are inspected. After the inspection, some local districts have been ordered to make changes to comply with the state-promulgated standards. The Board must classify and charter school districts and individual schools within each district, and must revoke the charter of any district or school that fails to meet the prescribed standards. R.C. 3301.16.

Furthermore, the Board administers and supervises the allocation and distribution of all state and federal funds for public education, R.C. 3301.07(C). It has the duty to determine that such funds are distributed

and used in accordance with law. The Board must withhold funds from school districts or schools that are not in compliance with legal requirements, unless for "good and sufficient reason" established to the satisfaction of the State Board and the State Controlling Board. R.C. 3317.01; former 3317.14.

### State Board Policy

During the years following its creation, the State Board established a policy regarding racial segregation. Although never reduced to writing, it nevertheless is discernible. Unlike its activities in other areas, the Board operated with a few narrow exceptions according to a "hands-off" policy in the area of school desegregation. Rather than using its supervisory powers to inquire into the possibility of law violations and its pursestrings to enforce compliance with the law, the Board developed policies and practices which effectively disabled it from acting at all in this area, thereby avoiding its obligation in the first instance to ferret out constitutional violations with the foreseeable result of maintaining and condoning constitutional violations by local boards. This conclusion is based on the following findings.

### I

From its inception, the Board was aware of litigation involving racial segregation elsewhere in Ohio. (Tr. 5758.) [1] Litigation in the public schools of Hillsboro, Ohio, had begun in 1955, and by the time of the Board's first meeting in January 1956 the Court of Appeals for the Sixth Circuit had rendered its decision (Tr. 5810–11). The District Court had found that black elementary children were being segregated into one of the schools, and the Court of Appeals ordered that they be admitted to the other schools on a nondiscriminatory basis (Tr. 5867). *Clemons v. Board of Education*, 228 F.2d 853 (6th Cir. 1956).

This litigation prompted discussion at an early State Board meeting about the possible existence of illegal racial segregation elsewhere (Tr. 5759). The minutes reflect the substance of those discussions. (Exhibit S–13, pp. 1–4.) Charles Lucas, a board member from the Cleveland area, referred to "allegations that the State of Ohio still has remnants of segregated schools." He therefore moved to have the State Board establish a committee to obtain its own set of facts regarding segregated schools in Ohio. The motion was defeated. Instead the Board adopted a resolution stating that "the determination of what constitutes unlawful segregation is a matter for judicial decision" and declaring that "in any case where courts have made final determination that unlawful segregation exists, this Board would then take action in accordance with the law." (Tr. 5760–61.) When Board members were discussing segregation at that time they contemplated discrimination of the kind condemned in *Brown I*—the intentional segregation of pupils on the basis of race (Tr. 5761).

In May 1956, Mr. Lucas presented another resolution in which the Board would acknowledge that remnants of racial segregation existed in Ohio, insist that each school comply with laws requiring equal treatment and declare that the Board would withhold funds from any district operating a racially segregated school after September 1956. (Tr. 5817; Exhibit S–13, p. 3.) He did not identify such districts (Tr. 5761–62; 5812–13; RH Tr. 126), nor did any other Board member identify any district in which racial segregation was believed to exist. (Tr. 5672.) This motion, too, was defeated.

### II.

Board Member Lucas was dissatisfied with this position and urged the adoption of a resolution which would require the Board to seek out districts in which segregation might be practiced. (Tr. 5759.) However,

---

1. References to the transcript of the original trial in this case are identified as "Tr."; those to the transcript of the hearing on remand are identified as "RH Tr."; and those to the portions of the Cleveland trial transcript admitted into evidence in this case at the hearing on remand are identified as "C Tr.".

a majority of the Board was of the opinion that this was beyond the scope of its authority. (Tr. 5760.) After further discussion it was agreed that an opinion of the Attorney General of Ohio should be obtained regarding the scope of the Board's authority in this area. (Tr. 5763.) Accordingly, at the June 1956 meeting the Board adopted a resolution requesting the Attorney General to give the Board an opinion on four questions concerning the Board's authority to investigate school districts and withhold funds if they should be in violation of law (Tr. 5764–66; Exhibit S–13, p. 4).

The July 1956 Attorney General's responsive opinion stated:

1. The term 'law' as used in section 3317.14, Revised Code [presently codified at Ohio Rev. Code Ann. § 3307.01 (Page Supp. 1977)] forbidding the distribution of state funds to school districts which have not 'conformed with the law,' is used in the abstract sense and embraces the aggregate of all those rules and principles enforced and sanctioned by the governing power in the community. Such term embraces the equal protection provision of the Fourteenth Amendment of the Constitution of the United States under which *the segregation of pupils in schools according to race is forbidden.*

2. The *primary responsibility for administering the laws* relating to the distribution of state and federal funds to the several public school districts *is placed with the state board of education*, subject to the approval of the state controlling board.

3. *It is the responsibility of the state board of education in the first instance to determine whether a particular school district, or the board of education of such district, 'has not conformed with the law' so as to require the withholding of state funds from such district.* In making such determination the state board of education should observe the requirements the Administrative Procedure Act, Chapter 119, Revised Code, as to notice, hearing, summoning of witnesses, presentation of evidence, degree of proof, and procedural matters generally.

4. Following a determination by the state board of education that a school district 'has not conformed with the law' so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for 'good and sufficient reason' established to the satisfaction of each board, offer a distribution of funds to such district notwithstanding such lack of conformity with the law.

1956 Op.Atty.Gen. Ohio 514, 520–21 (emphasis added). The Attorney General also stated that in the specific area of racial segregation, the fund-withholding provision was mandatory:

It follows, therefore, that in those cases in which your board finds as a matter of fact that racial segregation exists in a particular school district, the restrictive provisions of § 3317.14, Revised Code, must be deemed to apply.

*Id.*

After the receipt of the opinion of the Attorney General, it was clear to the State defendants that they had the primary responsibility and the power to investigate and determine whether local school districts were unlawfully segregated. Moreover, both State defendants were aware that there was an affirmative duty to act to eliminate unlawful segregation after becoming aware of its existence. As noted by the Court of Appeals, the parties appear to agree that the Attorney General's opinion is law which controls the State Board. *Penick v. Columbus Board of Education, supra,* 583 F.2d at 817.

However, the State Board did not, during the period from 1956 until at least 1968, use its investigative powers to uncover the unlawful segregation of public schools in Columbus or elsewhere.

The rationale for the Board's failure to investigate advanced by different board members is twofold. Certain members contended that a prerequisite to any such action was the presentation of a complaint to the Board. Others believed that it was for

the courts, and not for the Board, to make a determination whether segregation was unlawful. These contentions are discussed hereinafter.

### The Necessity of a Complaint

The Court has heard repeated assertions that the reason for the Board's inaction was its lack of knowledge of illegal segregation and that had such a problem been brought to its attention, it would have acted swiftly and promptly to investigate and use its powers to rectify any such problem.

Thus, a former State Board member, an attorney, testified that after the receipt of the Attorney General's opinion up until he left Board service in December 1959, no person or organization ever reported to the State Board or complained about unlawful segregation existing anywhere in any school district in the State of Ohio. When asked what the Board would have done in case an instance of unlawful segregation were ever brought to its attention, he testified:

> There isn't the slightest doubt in my mind that our Board would have acted promptly and affirmatively to work toward discontinuing any such segregation. I would say that the final, the last remedy, would have been withholding funds because it would have been an act directed against a great many innocent children of all races, but it would have acted against the individuals who were running such school districts, whether the Board or the Superintendent or whoever, in order to get them straightened out and headed in the right direction.

Similarly, another State Board member, also an attorney, testified as follows:

> Q. Suppose, sir, that the State Board became aware of unlawful activity on the part of a school district, now, under the attorney general's opinion and the statute, which is 3314.17, the State Board would have the right to withhold funds, but instead of going to the ultimate remedy, what, if anything, would the State Board attempt to do to correct the illegality?

> A. Well, we would try, I'm sure, to get them to stop doing whatever illegal thing they were doing.

(Tr. 5874.)

Dr. Martin Essex, State Superintendent of Public Instruction for ten years, acknowledged that the State Board has the capacity to conduct an investigation and make a finding in the area of racial discrimination or isolation (Tr. 6027). If unlawful discrimination were discovered, "then a recommendation would go to the Board relating to the withholding of funds." (Tr. 6027.) According to Dr. Essex, if a responsible parent or group of parents would allege an unconstitutional separation of races in an Ohio school district, the Board would "traditionally order an immediate investigation in the matter." (Tr. 6020.) There were two instances, he stated, in which the State Board was asked to investigate a claim of segregation in Ohio. These instances occurred in North College Hill and Dayton and are discussed below.

Dr. Essex testified that during his term in office no complaint of unlawful segregation in the Columbus schools had been made; furthermore, he had no reason to consider the Columbus District in violation of the law.

There is considerable difficulty with the claim that a complaint was a prerequisite to action by the Board. First, the State defendants did not have any formal complaint procedure. Apparently, complaints about all sorts of school-related matters could be and were presented to the Board by letter, by petition, or in person. Moreover, any member of the Board can present to the Board a complaint that has been made to that particular Board member. However, the Board neither publicized how a complaint should be lodged with it, nor when and where the Board held its meetings at which complaints could be presented.

Second, there were, over the years, several instances which might reasonably be considered complaints, but which did not prompt action by the Board or its predecessors. The record establishes that as early as 1953, Mr. Barbee W. Durham, Executive Secretary of the Columbus NAACP, wrote

to Mr. Clyde Hissong, State Superintendent at the time, complaining that the Columbus Board of Education had never hired Negro teachers on the secondary level (Pl. Exhibit 372). There is no evidence that any action was taken by anyone at the State level on Durham's letter. Next, Mr. Lucas' proposals in 1956 were rejected, in part because he did not have proof of unlawful segregation in any particular districts or schools. As is shown below, a thorough and extensive complaint submitted in 1971 was not acted upon.[2]

Finally, it is clear that the Board could act without first being presented with a complaint. This finding has support in the testimony of former Superintendent Essex himself:

> The State Board is not restricted to functioning on complaints. The State Board can initiate action if it so decides that the facts warrant initiating action or if there is evidence to that [effect] that would lead to the conclusion that there is reason to initiate action.

(Tr. 6136.)

It is noteworthy that the State Board did not wait for a complaint before it inspected schools to determine whether they complied with state-prescribed standards in other areas such as teacher certification. The investigatory process is routine in the area of determining whether Ohio school districts are in conformity with certain legislative and State Board-promulgated minimum standards. The State defendants, without complaint, probe into standards concerning school days, pupil promotion, admission of pupils to schools and programs, graduation requirements, teacher education certification, and others.

## The Necessity of a Judicial Determination

The other assertion made by the State defendants is succinctly stated in their proposed finding of fact, which is as follows:

> Prior to the late 1970's and the Supreme Court's opinions in *Dayton II* and *Penick*, it was the Department's judgment that it had no reasonable alternative but to wait until it received some notice of an unlawful condition before launching an investigation into the reasons for racial imbalance in a school dis-

---

2. The Board did take action in two other school districts in Ohio. Thus, in 1964, after an appearance before the State Board by an NAACP representative who complained of unlawful segregation at the North College Hill District, the State Board ordered by resolution that an investigation ensue and the District resolved the problem by closing a school. (Tr. 6021.)

In the situation involving Dayton, in 1970 the Dayton City School District adopted a resolution stating that it believed that prior practices of its board had unlawfully created segregation and requesting State Board assistance in correcting the situation. Dr. Essex testified that "a committee appeared before the State Board and requested assistance from the State Board in resolving what their Board had declared to be and their Superintendent had declared to be violations of—or discriminatory actions against minority persons in the operation of the schools" (Tr. 6022).

The State Board wrote to the Dayton Board: On June 7, 1971, the Ohio State Department of Education presented a series of recommendations to the Dayton Board on how to achieve constitutionally required desegregation. In its letter conveying the recommendations, a State Department of Education report stated:

"As the resolution of April 29, 1971 (of the Dayton Board), admitted 'the Dayton Board of Education recognizes that unequal educational opportunities for minority students now exists.' Inequality of such opportunities, for minority *and* majority students, has characterized the Dayton public school system throughout its history.

"Since the Board, *as an agency of state government,* has created the inequality which offends the Constitution, the Ohio State Department of Education must advise that the Dayton Board of Education clearly has an affirmative duty to comply with the Constitution; that is, as the Supreme Court has stated, 'to eliminate from the public schools all vestiges of state-imposed segregation.' "

After Board reference to the Superintendent for investigation, $8,000 was allocated to employ persons "from over the country who were knowledgeable in the area of segregation, integration, to make a scholarly investigation of the condition, make a report," (Tr. 6023). In addition to that, six or seven staff members were assigned to assist. The final allocation for the investigation personnel was about $43,-000.

trict (RH, Bowers, 175). The Department believed that prior to those decisions it could lead and persuade, but it could not compel the elimination of racial imbalances which were the result of neighborhood concentrations. *Id.*, 172–173.

This policy was officially adopted by the Board in its resolution of March 1956, in which it declared:

WHEREAS the determination of what constitutes unlawful segregation is a matter for judicial decision, and

WHEREAS, the State Board of Education has neither the means nor the right to take action on this question without final determination by the courts,

BE IT RESOLVED THAT in any case where courts have made final determination that unlawful segregation exists, this Board would then take action in accordance with the law.

(Exhibit S–13; Tr. 5760–61.)

The unsettled-nature-of-law theory has some surface attraction, but upon examination is not at all convincing. Surely, at least after 1956, the State defendants knew that (1) intentional segregation of school children by race violated the United States Constitution; (2) the State Board in the first instance had the responsibility to determine whether a particular school district, or the board of education "has not conformed with the law." 1956 Op.Atty.Gen. Ohio, *supra*, at 520. The choice of language made by the then Attorney General is straight-forward and without ambiguity. Neither the investigation in Dayton nor that in North College Hill was hampered by any unsettled condition of the law. At trial, State Board member Wayne Shaffer testified:

I believe that the United States Constitution ought not to be interpreted by the State Board of Education, quite honestly. I think it's being properly done in the courts, and I believe that that's where it ought to be done.

However, when referred to this testimony by Mr. Shaffer, Dr. Essex testified as follows:

Q. .... Now, my question to you, Dr. Essex, is, is the State Board able to determine whether a school district is in violation of the U.S. Constitution?

A. My answer to that question, Mr. O'Neill, is in the affirmative. It is yes. I have not discussed this matter with Mr. Shaffer since his appearance here. Hence, I do not know his rationale. I draw the assumption Mr. Shaffer was referring to an earlier period in the Board's history when it was first established in '56 and prior to the establishment of our office of Urban Education.

Q. I am not asking you to, you know, interpret what he was thinking of or what he might—

A. There is no question but what the State Board has the capacity to conduct an investigation and make a finding or make a recommendation or take action in the area of racial discrimination or isolation.

Q. Now, how does the State Board of Education make a determination that a school district is in violation of law?

A. It would be a preliminary exploration to determine some facts or the conditions that might be prevailing in that district to see if there is a violation of law. Then if brought to the attention of the district, which would be the common practice, and the district is unable or unwilling to correct what we perceive to be a violation of discrimination, then a recommendation would go to the Board relating to the withholding of funds.

He further related an available state procedure to litigate whether a violation of law exists.

### 1968 and After

It was not until 1968 that the State Board began to use its investigatory powers to determine the extent of racial isolation in the schools.

In early 1968, Superintendent Essex asked Dr. Robert O. Greer to come to Co-

lumbus to assist the Department of Education and the State Board in setting up a Division of Urban Education. (Tr. 5915.) Dr. Greer came to Columbus in February and became head of an Office of Urban Education, bearing the title of Assistant Superintendent for Public Instruction. (Tr. 5917.) The Office of Urban Education was one of the first of its kind in the United States. Dr. Greer met in Cleveland with an *ad hoc* committee of the Ohio Civil Rights Commission and members of the Urban League, the NAACP, and other concerned groups. Together they drafted a policy statement that was adopted at the May meeting of the State Board. This statement provided, in part:

> It is the policy of the State Board of Education that, in programs administered, supervised, or controlled by the Department of Education, every effort shall be made to prevent and to eliminate segregation of children and staff by reason of race or color.

(Exhibit S–13, p. 136.) As part of the statement, the Board recommended:

1. Specific effort on the part of all school districts to find ways to move toward the solution of the problems of *de facto* segregation;

2. A periodic ethnic count of pupils and employees by the schools of the State as a realistic basis for program planning.

On July 8, 1968, the State Board passed a resolution to implement the policy statement by conducting a statewide survey of hiring practices and racial balance in all Ohio schools. (Exhibit S–13, p. 14.) The survey was conducted and the findings were computerized, compiled, published and distributed to the State Board, the Department, and to the public. Dr. Greer described the survey as follows:

> We went out to survey the entire state because we didn't know what the situation was. I had to tell myself or find out for myself what is the situations in the urban centers in Ohio? So we used 300 schools, high schools, junior high schools and elementaries, surveyed them intense-

ly, a full evaluation with elementary secondary personnel. We employed ten specialists to go along with these teams who were no longer in education, men and women, and we went through the districts and took them apart.

> We added a survey on urban problems. We went into the issues of how the children are placed. How are they placed in regular classes and special classes? Are there vocational educational offerings? Is there funding for disadvantaged students? Do you have anyone who knows how to handle curriculum development? Are your teachers prepared to teach all kinds of children? These kinds of things we did.

This survey has been conducted annually (Tr. 6080). The first complete report was published in June 1970. It clearly revealed the racial imbalance in the assignment of administrative and teacher personnel in Columbus. The State defendants well knew as a result of their own survey that as late as the 1972–73 school year there were 250 black elementary teachers, representing 63.3% of all the black elementary teachers in the system, assigned to schools in which the student body was 80–100% black. In the same year, 34 elementary schools, all of which contained 80–100% white student bodies, had no black teachers assigned to them. (Tr. 6004.) *See Penick v. Columbus Board of Education, supra,* 429 F.Supp. at 238.

This matter was the subject of a 1974 conciliation agreement with the Ohio Civil Rights Commission after a complaint had been filed by the Columbus Area Civil Rights Council and after Dr. Connell had called the practice to the attention of a high state department official in 1971. This form of selection of assignments on a racial basis was obviously intentional.

The survey identified Columbus as having persistent problems of racial isolation, a condition which continued at the time of trial in June 1976 (Tr. 5978). The same result was made known to the Board by virtue of a similar survey conducted by the Ohio Civil Rights Commission with the help of Dr. Greer's office in 1968 (Tr. 5982–84).

The State Department has had repeated contact with the Columbus district since 1968 through both the Department of Urban Education, headed by Dr. Greer, and the later-established Office of Equal Educational Opportunity, headed by Mr. Bouldin. The State Department visits annually those districts most in need of desegregation assistance, among them Columbus. During these many contacts, the entire situation in the school district is discussed and information has been given to Columbus concerning the availability of federal funding to assist in the development of a desegregation plan. On several occasions, the State Department was asked by Columbus district staff to consider whether Columbus faced the possibility of litigation arising out of the racial isolation of its schools. (Tr. 5952–55, 5979, 5987.) It was upon the request for assistance of the Director of Human Relations for the Columbus Board that Dr. Greer came to the Columbus District (Tr. 5952). Columbus District officials made specific requests for information to develop means to eliminate its segregated schools, and in return many of the desegregation devices and techniques available and used elsewhere were presented to them. As stated by Dr. Greer:

> ... we went over these figures as they were submitted and informed the principals and the administrators at central office that a problem did seem to exist. All we could tell them was that they did have racial impaction. We couldn't define it as being one kind of segregation or another for the simple reason that there were buildings that were at that time completely integrated.

(Tr. 5952–53.) The Columbus officials were, however, advised by Dr. Greer's office that the open enrollment plans which they were formulating would be constitutionally deficient, because of the extent of racial impaction and isolation.

Although these personal contacts and discussions occurred steadily from 1968 through 1975, at no time did the State Department or the State Board initiate any investigation into the causes of the segregation admittedly existing in Columbus.

Although the Board offered "technical assistance" to the District concerning school desegregation, it never used its powers to enforce compliance with the Constitution. Dr. Greer attributed this to a lack of power to do so:

Q. Did you ever demand, insist, that Columbus use the integrative techniques you suggested?

A. Oh, no, no.

Q. And why not?

A. Demand on what basis? You can demand all you want to without—without the power of final authority, and all you do is offend. You can't get anyplace by demanding without the clout to follow up the demand.

(Tr. 5956–57.)

The Court finds the testimony of State Board member Wayne Shaffer accurately reflects an attitude of a majority of the State Board from its organization in 1956 until this lawsuit was filed:

Q. All right. Why, Mr. Shaffer, hasn't the State Board demanded that Columbus try some specific remedy for the racial concentrations that exist in some parts of a district such as boundary line changes or pairing or clustering of schools? Why haven't they asked to try some specific device respecting the assignment of children to schools?

A. I don't think we have any authority with respect to the assignment of pupils, and to request or demand or ask, whatever your term is, that they do something over which we have absolutely no authority, it seems to me would be a vain act on our part, not likely to produce any results, and might even be counter-productive.

Q. Does the State Board require the Department to recommend and to assist and to advise districts with respect to techniques and devices that might be used to reduce racial isolation?

A. Yes, I think that—that is the case.

Q. You advise and suggest, but you do not demand; is that it?

A. Correct.

(Tr. 5874–5876.)

In fact, the State Board knew by virtue of the 1956 Attorney General's opinion that it had the authority to investigate for nonconformity with the law and recommend a withholding of funds in the event they found such violations. The Board did not even consider using the sanction of fund withholding until 1978; yet the Board's power to use it remained unchanged over the years (RH Tr. 24). Similarly, the Board has vigorously used its powers to revoke school or district charters over the relevant period for non-compliance with minimum standards. (C.Tr. 2309–23.) Yet this power was never exercised to facilitate the dismantling of segregated systems.

The Court concludes that although there were available procedures for the discovery of unlawful segregation in Ohio, and the Board had the authority to remedy it, there was great reluctance to self-initiate any inquiry, and even more reluctance to exercise its power by withholding funding or using other available means as sanctions for a local district's maintenance of unconstitutional racial segregation.

The Office of Urban Education regularly published a "Mini Journal." It presented court decisions and other laws, and articles by desegregation specialists. The Office also published a "Maxi Journal." Volume II for June 1970 contains a "complete racial and educational survey of the impaction of students and staff and non-professional staff with a breakdown of percentages run by county, by district, by state." (Tr. 5937.)

The Department maintained a desegregation library and conducted workshops and seminars. The Office secured $300,000 worth of operational funds for the Kent State Desegregation Center to meet with districts across the state, to discuss the issues of desegregation, why it should be done and how it could be done. (Tr. 5933.) Desegregation Centers were also established at both Central State and Ohio State Universities.

In sum, the officials at the State Department of Education appear to have been as knowledgeable as any agency in the United States on the subject of segregation in public schools. Any assertion that the State defendants believed everything in Columbus was proper since they believed schools were being built in the neighborhood where growth occurred is a meritless oversimplification in light of the facts of this case.

In the Spring of 1971, Dr. Kenneth Connell conferred with Robert Greer, Arthur Bouldin, and representatives of the United States Office of Civil Rights and the Columbus Area Civil Rights Council. Dr. Connell, a consulting psychologist, had been an active member of the Northwest (Columbus) Area Council for Human Relations and the Columbus Area Civil Rights Council for several years.

Dr. Connell presented to Dr. Greer a 60-page document prepared by the Northwest Area Council relating to proposed litigation over the segregation of staff and students in Columbus schools (Tr. 6248). He described the document as follows:

It ... related to the non-response of the Columbus Public Schools to a proposed center for quality integrated education. It included review of findings of the select committee on equal educational opportunity. It included a variety of specific statistical information relating to the Urban League report, the OSU Advisory Commission report, staff segregation as reported in those reports, and a separate analysis I did.

It further provided a summary of certain building projects and their segregative effects in the period, I I believe, 1969 through '71, so that it substantially set forth the basic case as we saw it at that time for a finding of unlawful segregation.

(Tr. 6250–51.)

Dr. Connell further testified:

Q. Did you bring the details of this matter directly to the personal attention of Dr. Greer, or is it just something you left with him?

A. No, we discussed the matter in considerable detail with respect to what

the posture of HEW might be, what kinds of factors they looked at in establishing whether the district was in compliance. We talked with Dr. Greer about the role of the State Department of Education in this matter.

He subsequently did provide some materials, but provided no indication that they had a standard investigation process or that they could be of any substantial help with this matter, whether or not it went to litigation.

Dr. Connell stated that they met with Dr. Greer and persons on his staff "to determine what might be available through the State Department and HEW, and we did not know what could be available." (Tr. 6258.) "The purpose of the meeting was to determine what assistance could be rendered by the State Department of Education and HEW in remedying the segregation that we observed in the Columbus Public Schools." (Tr. 6260.) Connell described the meeting as cordial but not productive of any results. He stated:

When the bond issue failed in the spring of that year, that was when the Columbus Area Civil Rights Council and the Northwest Area Council turned to the Ohio Civil Rights Commission. We were never advised to do so by the Department of Education, Dr. Greer, but we turned there because we felt that there was an opportunity for some partial remedy at that time.

### Discussion

As mentioned hereinabove, the Court of Appeals provided this Court with five suggested areas of inquiry. The Court will now address them. Several areas are combined for discussion.

*The State Board's Knowledge of Intentional Segregative Practices, Failure to Protest or Restrain them by Withholding Funds and Continuance of Support in the Face of Such Knowledge*

The history of public education in Ohio advises all concerned that at one time in Columbus, as well as in other cities, separate schools were intentionally maintained for colored children. Columbus last reported separate schools in the annual statistical report to the Department of Education for 1953–54. The "separate schools" category was deleted after the decision in *Brown I, supra.* When that category was first made a part of the reporting requirements, a fair inference may be that it requested data concerning intentionally segregated schools for colored children. This inference fits with the sorrowful history of the creation of such schools. However, there is no direct documentary evidence that the schools Columbus listed under that heading in 1954 were separate as a result of segregative design. The Court notes that in its prior opinion, it reached that conclusion regarding some Columbus schools, but only with further specific facts which may not have been available to the State defendants.

Given the bare information that Columbus had a number of separate schools for colored children in 1954 does not justify the inference that such schools were intentionally segregated or never dismantled after having been so segregated. This is so because laws requiring separate schools for colored children were eliminated years before. There simply must be a stronger factual basis for drawing the inference plaintiffs would have the Court draw. The reporting data are significant, however, as mentioned hereinafter.

The Court does find that the State Board did, at least upon learning the results of their own 1968 survey, have knowledge of one of the intentional segregative practices of the Columbus defendants. The State Board was aware of the general practice of assigning black teachers only to those schools with substantial black student populations, found by this Court in its 1977 opinion and noted by the Supreme Court on its review. The Board, however, continued to fund and otherwise support the Columbus District in the face of such knowledge. They did not protest the practice; instead, it persisted until resolved by a consent decree between the Columbus defendants and the Ohio Civil Rights Commission in July 1974. *See Penick v. Columbus Board of Education, supra,* 429 F.Supp. at 238.

*Motivation of the State Board in Failing to Investigate the Reasons for de facto Segregation (Racial Impaction)*

The State Board can be charged with knowledge that *de jure* segregation of school children by race was imposed by state law until 1887. It can be charged with knowledge, by virtue of the reporting requirements of its predecessors, that separate schools for black and white children continued to be operated until 1954 in Columbus and elsewhere in Ohio. Their own files contain documents identifying separate schools in Columbus. *See also Penick v. Columbus Board of Education, supra,* 429 F.Supp. 234–36. It further knew, by virtue of the *Brown I, supra,* opinion of the same year, that *de jure* segregation was unlawful and that a duty was lodged with the proper authorities to eliminate the racial isolation caused by unconstitutional acts. *Brown II,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

From its inception, the State Board had more than a "mere right to control" the activities of local school boards; it was explicitly given authority to supervise public education by the statute which created it. R.C. 3301.07. Its predecessor failed to exercise such supervision in 1953 when asked to do so by letter from Mr. Durham. The Board itself refused to inquire into allegations by one of its own members, Mr. Lucas, in 1956, that "remnants" of segregated schools persisted.

The State Board's supervisory obligation was spelled out clearly by the Ohio Attorney General's opinion in 1956. Thereafter, any contention that the State Board did not bear the primary, statutory duty, *in the first instance,* to investigate the existence of segregation in the public schools, to ascertain its causes and to use its powers to eradicate it, "root and branch," is without justification.

Instead, the State Board adopted a "hands-off, let someone else do it" approach which amounted to no approach at all. This neutrality overrode the Board's clearly prescribed mandatory affirmative duty as opined by the then Attorney General.

Rather than disavow or contest the substance of the legally described solemn obligation of the Board, for a number of years the Board simply chose to ignore it. Although there is no evidence that the Board did not recognize and appreciate the correctness of the opinion's prescription, since its creation the Board has, in effect, related that it would not do its duty unless someone informed it that its duty needed to be done.

The Board avoided its duty of investigating school segregation by pursuing an unwritten policy of requiring "complaints" rather than initiating its own investigation. This policy of requiring complaints was curiously unique. In no other area of its supervision did the Board require complaints prior to investigation.

The effectiveness of the complaint system in preventing investigations was compounded by the Board's failure to tell the public that the complaint system was in fact being used. The Board was thus both unwilling to investigate by its own initiative and apparently unwilling to tell the public how to trigger an investigation. The result was almost total insulation. *See* footnote 2, *supra.* Even after the formation of the Office of Urban Education with its substantial assembly of information concerning the Columbus schools and expertise in modern school segregation matters, the State Board continued to take the position that there was no reasonable cause to take a look to determine whether Columbus had a problem with the United States Constitution.

There is, indeed, no evidence that the State defendants made any effort to self-initiate any investigation into the cause of the racial impaction of any urban school district in Ohio. *See Reed v. Rhodes,* 500 F.Supp. 404 (N.D.Ohio 1980); *Brinkman v. Gilligan,* 503 F.2d 684 (1974). While the knowledge that the Court has found on the part of the Board, other than that relating to faculty assignments, does not rise to the level of actual knowledge of intentional segregative practices as described by the Court of Appeals, the Court does find that it rises to such a level that would cause a reasonable person, charged with the same

legal duties as are the State defendants, to initiate an investigation into the causes of segregation in the Columbus public schools. This was never done.

Given the contents of the files of these defendants, and the vast amount of their admitted expertise in desegregation matters, any presumption that all of the racial imbalance in Columbus resulted from racially neutral causes is unreasonable. Reason dictates that there was ample cause to inquire whether Columbus was in conformance with the requirements of the Constitution.

In the Court's view the failure to investigate was another manifestation of the enduring policy of the State Board to let some other governmental agency handle this emotionally-charged issue. This was in clear derogation of the Board's obligation under the law.

### Effect of the Above Findings under Dayton I (Incremental Segregative Effect)

In an earlier opinion this Court discussed a reciprocal effect between the color of the school and the color of the neighborhood it serves.

> The racial composition of a neighborhood tends to influence the racial identity of a school as white or black. This identification comes in the form of student, teacher, and administrative assignments as well as the location and attendance boundaries of the school. When the number of black pupils increases, the number of black teachers increases, and a black principal is assigned; the school then becomes less attractive for white students to attend. The racial identification of the school in turn tends to maintain the neighborhood's racial identity, or even promote it by hastening the movement in a racial transition area. White families tend to cease migrating into such a neighborhood, and tend to move out of the area.

*Penick, supra*, 429 F.Supp. at 259.

After 1968 the data collected by the State defendants clearly revealed the segregated fashion in which teachers and administra-

tors were intentionally assigned. It is reasonable to infer that the vast amount of information on school desegregation accumulated by the Office of Urban Education included comment on the reciprocal effect of the assignment of teachers and staff on a racially segregated basis. Surely, the logical result of biased assignment of personnel was well known to the experts at the State Department of Education. The State defendants again failed to act to correct this intentional practice of the Columbus defendants which directly contributed to the racial imbalance in the schools.

■ In addition, the Court has found the State defendants were aware of circumstances concerning the Columbus school system that are sufficient to trigger their duty to investigate to determine whether the system was unlawfully segregated. Although there is no evidence of racial animus on the part of these defendants, the evidence certainly supports the inference that the State defendants reasonably should have known that in all probability Columbus had a substantial problem of unlawful racial segregation. The Court is convinced that the failure to investigate was an intentional failure to perform a duty required by law and that the only logical reason for such a failure is intentional condonation of the unlawful status quo. This failure in turn amounts to a proximate cause of plaintiffs' deprivation. The Columbus defendants had nothing to fear from the persons charged by the State of Ohio with the first line responsibility of assuring all Ohio's public school children lawful treatment. So, the unconstitutional state of affairs continued after the formation of the State Board, after it knew that historically Ohio had first required and later permitted separate schools for colored children, after receipt of the 1956 Attorney General's opinion, after the receipt of the statistics of the 1968 racial study, after the establishment of an Office of Urban Education, after notice of where schools were built in growing Columbus, after Dr. Connell's visit, after the District Court's determination in *Dayton v. Brinkman, supra*, and long after school de-

**942**

segregation had become an agonizing issue in urban America. It cannot be said that the State defendants looked the other way while constitutional rights were thwarted; it can be said, however, that they closed their eyes knowing the law required them open.

If the State defendants had acted within a reasonable time after the receipt of the 1956 Attorney General's opinion, even working at a slow pace, the Columbus schools could have been directed towards and have achieved an appropriate remedy long before this lawsuit was filed. Failure to have done so causes this Court to conclude that the State defendants equally share with the Columbus defendants the responsibility for the system-wide unlawful segregation in the Columbus School District.

### ORDER

It is ORDERED that the State Board of Education and the State Superintendent of Public Instruction, their officers, agents, and employees, and all other persons in active concert and participation with them be, and they hereby are, permanently enjoined from discriminating on the basis of race in the operation of the Columbus Public Schools, and from creating, promoting, or maintaining intentional racial segregation in any Columbus school facilities.

It is further ORDERED that the State defendants share equally with the Columbus defendants all expenses incurred or which will be incurred in remedying the unconstitutional racial segregation found in this case in the Columbus School District.