Robert Anthony REED III, et al.,
Plaintiffs-Appellees,

v.

James RHODES, et al., Defendants,

and

Ohio State Board of Education and Ohio Superintendent of Public Instruction,
Defendants-Appellants.

No. 80–3700.

United States Court of Appeals,
Sixth Circuit.

Argued June 19, 1981.

Decided Oct. 21, 1981.

---

Mark O'Neill, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, Ohio, for defendants-appellants.

Thomas I. Atkins, Teresa Demchak, Gen. Counsel, NAACP, New York City, James L. Hardiman, Cleveland, Ohio, William E. Caldwell, Elizabeth McKanna, Ratner & Sugarmon, Memphis, Tenn., Solvita McMillan, Cleveland, Ohio, for plaintiffs-appellees.

James P. Turner, Walter W. Barnett, Joan A. Magagna, Dept. of Justice, Washington, D. C., for amicus curiae, U.S.A.

Before EDWARDS, Chief Judge, and LIVELY and ENGEL, Circuit Judges.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

This is the Cleveland desegregation case which has been returned to this court after our remand to the District Court for new findings of fact concerning the question of intentional segregation on the part of the defendants-appellants, Ohio State Board of Education and Ohio Superintendent of Public Instruction. *Reed v. Rhodes*, 607 F.2d 714 (6th Cir. 1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980); *Reed v. Rhodes* on remand, 500 F.Supp. 404 (N.D.Ohio 1980). The District Judge on remand entered eight findings of fact which he viewed as establishing that the State Board and its Superintendent had knowledge of serious and intentional discrimination against black children in the Cleveland School system and continued to support that school system including its segregative practices through state financing in spite of that knowledge and in spite of a state law duty to withhold such financing. He held that this record represents intentional segregation within the meaning of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Dayton Board of Education v. Brinkman*,

443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979). We affirm.

This court's remand spelled out our understanding of intentional segregation as the Supreme Court has employed that concept in these cases (and others).

While in some respects the findings of segregative purpose on the part of the state serve to meet the Dayton requirements, [*Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977)], Dayton appears to us to negate a state liability finding entered principally on the ground of failure of the state to compel its subdivision to comply with the United States Constitution. As we have indicated in the Columbus opinion, [*Penick v. Columbus Board of Education*, 583 F.2d 787 (6th Cir. 1978), aff'd 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979)], knowledge by the state of intentional segregative practices on the part of the local board and intentional support of the local board in pursuing such practices appear to be requirements for a finding of constitutional violation. For these reasons, the question of state board liability is again remanded to the District Court for answers to the questions posed in *Penick v. Columbus Board of Education.*

607 F.2d at 718.

In the *Penick* opinion, we remanded for the District Judge to make findings on the following:

1) The State Board's knowledge (if any) of the Columbus Board's intentional segregative practices, 2) the State Board's failure to protest or restrain them by withholding funds, 3) the State Board's continuance of support in the face of such knowledge, 4) the motivation of the State Board in failing to investigate the reasons for de facto segregation, and 5) the effect of findings if any, under 1, 2, 3 and 4 above, as suggested in [*Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977)].

583 F.2d at 818.

The District Judge's answers and detailed findings of fact concerning defendants' knowledge of and participation in intentional segregation in Cleveland are as follows:

A. State Defendants' Knowledge of Intentional Segregative Practices in the Cleveland Public School District.

\* \* \* \* \* \*

The Court finds that the State defendants either (1) had knowledge of the existence of substantial intentional segregative practices by the Cleveland defendants, or (2) were confronted with information of such magnitude that such knowledge could be imputed to them; and that their failure to investigate and to correct the violations was intentionally supportive of such practices.

This finding is based on the following:

1) As early as 1930, the State defendants were aware that the Cleveland Board of Education was operating special schools for significant numbers of black children. (Plaintiffs' Exhibit 21). These separate schools were being maintained long after the General Assembly and Supreme Court of Ohio had declared separate schools to be abolished.

2) In the late 1950's the State defendants granted a waiver to the Cleveland Board of Education from compliance with minimum hour-per-day standards. This permitted the Cleveland defendants to provide less than the required daily hours of education to students in over-crowded schools, the great majority of whom were black. This Court has previously found this action to be an intentional segregative act on the part of both the State and Cleveland defendants. 422 F.Supp. 708, 793; 455 F.Supp. 546, 565 (remand opinion).

The state defendants repeatedly have contended that they never were advised of the number or identity of the schools, or the race of the pupils involved. However, evidence now indicates that the State defendants did request the "names of schools and grade levels" to be affected (Plaintiffs' Exhibit 28) and no evidence suggests that this

evidence was not produced. Moreover, at all times the State Department of Education had access to relevant data regarding the schools to which waivers were granted.

3) In 1967, a report on "Racial Isolation in the Cleveland Public Schools" was prepared by Dr. Willard Richan of Case Western Reserve for the United States Commission of Civil Rights. (Plaintiffs' Exhibit 224 [Trial]). This report detailed certain intentionally segregative acts performed by the Cleveland Board of Education. (Tr. 225). Unbelievably, the State defendants claim they were never aware of such a study until the original liability trial in 1976. (Tr. 223–224). However, evidence indicates that this study was mentioned in a public presentation to the State Board of Education on racial problems in the Cleveland public schools in April 1970. (Plaintiffs' Exhibit 46). Specifically, the question was posed to the State Board: "Do you make use, for example, of U. S. Civil Rights Commission findings on policies of the Cleveland School System?" (*Id.* at 2). The fact that no copy was requested and no questions were asked regarding the findings cannot shelter the state defendants from knowledge of the existence of the report. This represents another example of highly relevant information concerning segregation made available but not pursued by the state defendants.

4) In 1970, racial tension in the Collinwood area of Cleveland in Collinwood High School reached a point where the Cleveland Police were no longer able to control the violence and the National Guard had to be alerted and stationed in the area. (Tr. 311–314, 442; Plaintiffs' Exhibit 47; 48). The adamant refusal of the Cleveland Board of Education to reassign black students from overcrowded, all-black Glenville High School to adjacent, underutilized and predominantly white Collinwood High School contributed to this tension. (Tr. 3945–3960; Plaintiffs' Exhibit 60).

The racial problems confronting the Collinwood and Glenville High Schools in Cleveland prompted concerned parents to seek assistance from the federal government. On April 10, 1970, a letter was sent to civil rights specialist Leonard Hamilton of the Department of Health, Education and Welfare by the Glenville Task Force on Education and the Collinwood Committee of Black Concern. (Plaintiffs' Exhibit 55). That letter requested the withholding of federal funds from the Cleveland Board of Education because of various segregative practices, including: discriminatory gerrymandering of the Collinwood High School district; discriminatory transfers of black students out of Collinwood High School; disproportionate black faculty; and overcrowding of all-black Glenville High School resulting in inferior facilities and education. (*Id.*) It stated that members of the community would "be pleased to present evidence to support our claims of discriminatory practices in the Cleveland schools." (*Id.*)

A copy of this letter calling "for an investigation of discriminatory practices in the Cleveland School System" was sent by Mrs. Gaines to Robert Greer, Assistant Superintendent of Urban Education, on April 27, 1970. (Plaintiff's Exhibit 56). Despite receipt of this letter detailing specific claims of segregative practices, the State defendants undertook no investigative or corrective actions. The State Superintendent was "not really sure of what happened with HEW" (Tr. 570) and claims that he was not informed of the contents of the HEW letter (Tr. 572).

Fortunately, the Department of Health, Education and Welfare did undertake to investigate the complaint of the Collinwood and Glenville parent groups. Its investigation revealed that

(1) Some education services provided to students at Glenville are not equal to those provided at Collinwood, (2) pupil assignment and boundary practices have created an overcrowded school at Glenville and an underutilized school at Collinwood.

HEW's report concluded that "[t]he comparison between Glenville High School, 100 percent minority, and Collinwood High 30 percent minority, indicates that an unequal situation exists between the two schools," in

eight areas, including equipment, library facilities, vocational course offerings, counselling, special education, and faculty assignments.

(Plaintiffs' Exhibit 62).

The evidence presented with regard to the HEW letter and finding indicates that Assistant Superintendent Greer did have knowledge of substantial claims of segregation in the Cleveland public schools. However, consistent with a policy of calculated ignorance and inaction, no investigation was ever conducted.

5) Parental concern over the situation at Collinwood and Glenville High Schools did not end with a letter being sent to the Department of Health, Education and Welfare. Fortuitously, two concerned parents, Mr. Rufus Pierce and Mrs. Edith Gaines, were informed by Mildred Madison, a newly elected black member of the State Board of Education from Cleveland, that they could appear before the State Board of Education. (Tr. 315–317, 398). Mr. Pierce and Mrs. Gaines told Mrs. Madison that they wished to complain about deliberately segregative student and faculty assignment plans in Cleveland. (Tr. 321–322). Mrs. Madison discouraged them from raising general claims of segregation in the Cleveland public schools with the State Board, and advised them that State Board members had little power or influence and therefore that there was little likelihood of help from the State. (Tr. 398–399). Mr. Pierce and Mrs. Gaines also were advised about the form which their prepared statements should take. (Tr. 399). This advice was followed even though both parents wished to say more about the problems of racial segregation and discrimination in Cleveland.

(Tr. 321, 402).

On April 13, 1970, the day of their presentation to the State Board of Education, Mr. Pierce and Mrs. Gaines met with Assistant Superintendent of Urban Education Greer. (Tr. 318, 427). During this meeting, Mr. Greer instructed both of them as to what they were permitted to say to the State Board. Mr. Pierce, for example, testified that he indicated to Mr. Greer that he wished to discuss "violence and segregation in the Cleveland Public Schools, especially at Collinwood." (Tr. 321); the number of black employees in the system; the racial treatment of students; and desegregation of the system in general. (Tr. 323–324). He was advised by Assistant Superintendent Greer that he "could only ask questions", "could not name names or places," and "could not discuss specific cases of isolated segregation." (Tr. 321–324). Rather, his remarks were to be "general" (*Id.*) and all "harsher" words had to be deleted. (Tr. 356). Mrs. Gaines, on the advice of Mr. Greer, actually deleted references to overcrowding and segregation at Glenville High School and the absence of multi-cultural curriculum and materials at Collinwood High School. (Tr. 423–440; Plaintiffs' Exhibit 61).

During their five-minute presentations to the Board, the two parents were still able to raise serious questions about the problems of racial segregation in the Cleveland public schools and the inability or unwillingness of the Cleveland Board of Education to respond to these concerns. (Plaintiffs' Exhibit 46). Consistent with the suggestions of Mrs. Madison, both parents structured their presentations to follow the Board's 1968 Policy Statement on Equal Education Opportunity. (*Id.*) During the public session, no board member asked any questions or requested specific details about the problems of the Cleveland public schools. (Tr. 332, 409).

After presentation to the State Board, Mr. Pierce and Mrs. Gaines met with Assistant Superintendent Greer, Board Member Mildred Madison, a representative of the Department of Justice, and others. (Plaintiffs' Exhibit 49). Mr. Greer was asked to come to Cleveland to provide assistance to local school officials, and responded that such a trip required an invitation from the local officials. (Tr. 400–401).

Subsequent to the April 13, 1970 State Board meeting, Assistant Superintendent Greer prepared a memorandum to Superintendent Essex containing follow-up replies

to the questions asked by Mr. Pierce and Mrs. Gaines. A copy of this memorandum was sent to Mr. Pierce and Mrs. Gaines, as well as to Cleveland Superintendent Paul Briggs. (Plaintiffs' Exhibit 49; Tr. 333–339, 409–410).

Both Mr. Pierce and Mrs. Gaines felt that their presentation to the State Board constituted a "complaint" (Tr. 325, 330). They were seeking help from the State Board to ease the racial tensions that had so recently erupted in violence in the schools. They were after assistance, not information about what the State Board had done in the past. (Tr. 330, 353). However, they were never told of any technical or procedural requirements needed to raise their presentation to a "complaint," as opposed to a "concern" or a "request for information" (Tr. 325, 326). The response they received—the Greer-Essex memorandum—was regarded as an unsatisfactory response to their request for state help to solve the racial problems. (Tr. 340–341, 409–410).

Significantly, the Greer-Essex memorandum reveals that the State Department of Education had "been kept informed of the situation at Collinwood." (Plaintiffs' Exhibit 49, p. 1). The state defendants clearly were aware of the racial nature of the problem. Combined with the presentation made by Mr. Pierce and Mrs. Gaines, there is no doubt that the State defendants had knowledge of the existence of arguably segregative practices in Glenville and Collinwood High Schools.

The Greer-Essex memorandum also is significant in that it states with reference to the Collinwood situation: "Legal authority for the Department to function in a capacity other than advisory does not exist." (Id.) Such a statement was a clear misstatement of the legal authority under which the State Board and Department of Education operated. See Attorney General's Opinion, July 9, 1956; O.R.C. § 3301.07. It was effective, however, in convincing Mr. Pierce and Mrs. Gaines that the State's role in eliminating segregative practices was minimal and that their continued efforts to secure assistance from the State defendants would be fruitless. (Tr. 432–435).

The conduct of the State defendants in dealing with the matters presented by Mr. Pierce and Mrs. Gaines merely reflects a deliberate policy of following procedures designed to insure that important information regarding desegregation is never available. While the State defendants refuse to investigate unless a formal complaint is filed, the requirements for the filing of such a complaint are never communicated to the public. And even if a "complaint" is attempted to be filed, the Superintendent has unbridled discretion to apply the label of "concern" or "request for information", neither of which trigger an investigation. In any event, the State defendants limit those who might otherwise press complaints by claiming that they can act solely in an advisory manner.

6) In 1968, the State Department of Education undertook a survey of each school and school district in the State. This survey was reported completely by June, 1970, and identified Cleveland as one of the ten most racially isolated school districts in the State of Ohio. (Plaintiffs' Exhibit 379 [Trial]).

7) In 1975, representatives for the State Department of Education participated in numerous meetings with representatives of HEW and the Cleveland Board of Education to discuss HEW's denial of Cleveland's application for Emergency School Assistance Act funding. (Plaintiffs' Exhibits 203; 204; 205; 206; 207 [Trial]). The application was denied because of the failure of the Cleveland defendants to incorporate an acceptable plan to reduce racial isolation in schools. (Id.) In the face of this extensive involvement by the State Department of Education and obvious awareness of the serious racial problems in Cleveland, the State defendants chose to deny that they had knowledge of any de jure segregation. The weight of the evidence clearly suggests otherwise.

The evidence reveals that the State defendants, or their employees, had knowledge of allegations of segregative acts in the Cleveland public schools, and informa-

tion documenting the existence of such acts. In no instance did the State Board or Department determine to investigate such matters. Rather they chose to ignore information regarding the existence of such practices, opting instead for a policy of calculated ignorance, and therefore, inaction.

8) Members of the State Board of Education were made aware of the segregated nature of the Cleveland public schools in many and varied ways. Mr. Wayne E. Shaffer, who was a member of the State Board from its creation in 1956 to the present, testified that "we couldn't help but be aware that Cleveland had some very serious problems and that they were connected with minority matters. We know that, Dr. Briggs was before us many times. His predecessor and his predecessor's came before our board. We know that there were acute problems in Cleveland .... We know that there were schools that were predominantly black. We know that there were other schools that were predominantly white." (T. Tr. 3585)

*Reed v. Rhodes,* 500 F.Supp. at 416–420.

We have examined these findings of fact against the lengthy record in this case. We cannot hold that any of them are "clearly erroneous." They appear to us to charge the state defendants with detailed knowledge of the Cleveland Board's segregative practices.

The District Judge made additional analyses of the defendants' knowledge of school segregation, their legal duty to correct same and their motivation in failing to do so.

D. The Motivation of the State Defendants in Failing to Investigate the Reasons for *De Facto* Segregation.

The State Board of Education and the Department of Education have been, and are, aware of the existence of many predominantly one race schools in large urban areas in the State of Ohio. (Tr. 600, 152). They were aware, as of 1970, that Cleveland was one of the ten school districts with the most racial isolation in the State of Ohio (Plaintiffs' Exhibit 379 [Trial]).

Despite knowledge of extensive *de facto* segregation in Ohio generally, and in Cleveland specifically, the State defendants did not undertake any investigation of the reasons for such segregation.

\* \* \* \* \* \*

The Court rejects the defendants' contention that the absence of a formal complaint justifies the failure to conduct an investigation of segregation in Cleveland. The Pierce-Gaines presentation to the Board in 1970 clearly suggested the existence of illegal segregation in Cleveland and was intended to be a complaint. *See* pp. 418–420, *supra.* That this presentation was not considered a complaint is indicative of the use of discretionary procedural devices to shelter the Board from knowledge, and therefore an obligation to act. In any case, other information made available to the State defendants suggested the existence of illegal segregation in Cleveland.

\* \* \* \* \* \*

The failure of the State defendants to investigate *de facto* segregation ultimately appears to have been motivated by a desire to maintain the status quo. Instead of responding to duties imposed by state law and the federal constitution, the State Board and Department of Education chose to abdicate their responsibilities to insure equal protection of the laws.

\* \* \* \* \* \*

E. The "Incremental Segregative Effect" of the State Board's Action and Inaction.

Had the State Board acknowledged its affirmative obligation under state and federal law to discover and eliminate local segregation, and had it exercised its power to withhold state monies from local segregated school systems or to dissolve and consolidate school districts, the likelihood is that the Cleveland Public School System would not have been in the sorry, segregated condition that this Court found it in 1976. While the notion of "incremental segregative effect" is not

a mathematically precise one, this Court concludes that, had the State intervened at the appropriate time, the intentional segregation rampant within the Cleveland school system could have been eliminated "root and branch" many years ago. The State Board's continued torpidity in the face of clear evidence of *de jure* segregation of the Cleveland schools had the "incremental segregative effect" of allowing continued segregation where it need not have continued.

\* \* \* \* \* \*

The findings of intentional support and knowledge of segregative practices in the Cleveland public school district undergird this Court's conclusion that the State defendants are jointly liable for the creation and maintenance of illegally segregated public schools in the City of Cleveland.

Therefore, the State defendants are, along with the Cleveland defendants, responsible for implementing a remedy which will eliminate all vestiges of unconstitutional segregation in the Cleveland public school district.

500 F.Supp. at 422, 423, 425.

The state defendants responded to the District Judge's conclusions with two main arguments. First, they deny prior knowledge of the segregative practices found by the District Judge, mainly because no complaints were filed before them. Second, they assert that they had no duty to inform themselves and provide a remedy, until and unless there was court adjudication of the illegality of the questionable segregative practice or incident.

For six years (from 1956 to 1961) the state board and the state superintendent waived minimum classroom instruction limits by granting express exemptions to Cleveland school officials, enabling these to institute split sessions which provided children with only three and a half hours of schooling instead of the required five hours. It is a fact that the overwhelming majority of the schools in Cleveland which thus provided less than the minimum school time were virtually all black. Although the state defendants denied knowledge of the number, identity and racial composition of these schools, it is now evident that, in addition to having access to this data at all times, they requested this specific information about the schools to which waivers were granted.

There is also evidence on the record that the state defendants were made aware of the underlying causes of racial tensions in overcrowded black schools; there is evidence that the existence of the Richan report which catalogued certain racially segregative actions of the Cleveland school officials was made known to the state Board of Education.

For these and other reasons[1] in this record, we find the state defendants' argument that they lacked knowledge of unconstitutional segregation to be a disingenuous contention.

We turn now to the second argument advanced by the state defendants, namely, that absent a legal finding by a court, they had no duty to take action to end segregation in Ohio schools.

In early 1956, Mr. Charles Lucas, the only black member of the State Board of Education, moved that the Board withhold state funds from any school district that practiced racial discrimination. The motion was defeated. He then suggested that an opinion on the matter be sought from the Attorney General of Ohio. This motion was also defeated.

In May of 1956, Mr. Lucas proposed the following motion:

1. Plaintiffs argued that official reports required for many years by the defendant state board predecessors from every school district concerning the existence of "separate schools for colored children" were so indicative of knowledge of intentional segregative conduct on the part of the state board that such reports should weigh heavily in the Cleveland case, although the Cleveland Board consistently answered "None" on the report forms. The record here is such as to require affirmance of the District Judge with or without reliance on these reports. *But see Penick v. Columbus Board of Education,* —— F.2d ——, —— (6th Cir. 1981). (Nos. 81–3072, 3102, 1981).

WHEREAS: The Supreme Court of the United States has clearly defined racial segregation in the public schools as unconstitutional, and

WHEREAS: The Supreme Court of the State of Ohio has ruled racial segregation in the public schools unconstitutional, and

WHEREAS: Remnants of racially segregated schools exist in Ohio, and

WHEREAS: The Ohio State Board of Education is specifically authorized in House Bill #212 to administer the schools within the framework of existing law, and to regulate the admissions of pupils and to set up the highest possible educational standards for the public schools of Ohio,

BE IT RESOLVED: that the Ohio State Board of Education go on record as insisting that each public school under its jurisdiction operate within State and Federal laws requiring equality of treatment of all pupils, regardless of race, creed, or color under penalty of loss of state funds. BE IT FURTHER RESOLVED: that the Ohio State Board of Education, on and after September, 1956 will instruct the State Controlling Board to withhold funds from any school district which operates a racially segregated school in defiance of the public policy of the State of Ohio, the Ohio Supreme Court and the Supreme Court of the United States.

This motion was also defeated but Lucas' insistence did finally secure a request from the Board to the Attorney General concerning the Board's authority to take action concerning racial discrimination in Ohio's schools. The answer written by Attorney General C. William O'Neill (later to be Chief Justice of Ohio's Supreme Court) was unequivocal: [2]

1. The term "law" as used in Section 3317.14, Revised Code, forbidding the distribution of state funds to school districts which have not "conformed with the law," is used in the abstract sense and embraces the aggregate of all those rules and principles enforced and sanctioned by the governing power in the community.

Such term embraces the equal protection provision in the Fourteenth Amendment of the Constitution of the United States under which the segregation of pupils in schools according to race is forbidden.

2. The primary responsibility for administering the laws relating to the distribution of state and federal funds to the several public school districts is placed with the state board of education, subject to the approval of the state controlling board.

3. It is the responsibility of the state board of education in the first instance to determine whether a particular school district, or the board of education of such district, "has not conformed with the law" so as to require the withholding of state funds from such district. In making such determination the state board of education should observe the requirements of the Administrative Procedure Act, Chapter 119., Revised Code, as to notice, hearing, summoning of witnesses, presentation of evidence, degree of proof, and procedural matters generally.

4. Following a determination by the state board of education that a school district "has not conformed with the law" so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for "good and sufficient reason" established to the satisfaction of each board, order a distribution of funds to such district notwithstanding such lack of conformity with the law.

The Attorney General's opinion also specified the State Board's obligations in the area of racial segregation:

It follows, therefore, that in those cases in which your board finds as a matter of fact that racial segregation exists in a particular school district the restrictive provisions of Section 3317.14, Revised Code, must be deemed to apply.

1956 Op.Atty.Gen. Ohio 514, 520–521, 518.

 We do not know how more specifically the defendants could have been in-

---

**2.** The full text of the Attorney General's Opinion is attached as Appendix.

structed on their duty, under both state and federal law, to require the schools they were helping to finance, to desegregate any schools which had been intentionally segregated and to withhold state financing from systems which refused. This record shows that in the history of Ohio, defendants never fulfilled that duty.

We now turn to the list of findings which were sought in our remand of this case.

As shown above in this record and as found by the District Court:

1. The State Board had direct knowledge of the Cleveland Board's intentional school segregative practices.

2. Under the laws of Ohio, the defendant State Board of Education and its Superintendent had "the primary responsibility" for determining whether its school districts (including the Cleveland Board of Education) "has conformed with the laws."

3. The State Board never, in relation to Cleveland, discharged its legal "responsibility . . . to determine whether a particular school district or the board of education of such district 'has not conformed to the law' so as to require the withholding of state funds from such district."

4. To the contrary the record shows that the State Board continued to support the Cleveland Board's activities including (among others) financing racially segregated teaching staffs, segregated schools and discrimination in sharply reduced educational programs in black schools as compared to white schools.

5. The motivation (and the effect) of the State Board on this total record must be held to be the perpetuation of racial segregation.

6. The incremental effect of the State Board's actions and inaction is the total failure of compliance with the constitutions and laws of the United States and of Ohio in the performance of the duty to eliminate racial segregation in the Cleveland School system.

The judgment of the District Court is affirmed.

APPENDIX

Columbus, Ohio, July 9, 1956

Mr. R. M. Eyman, Executive Secretary, State Board of Education
State Office Building, Columbus, Ohio

Dear Sir:

I have for consideration your request for my opinion in which the following questions are presented:

"1) Does the term 'the law and the rules and regulations pursuant thereto' in said Section of the Revised Code (Section 3317.14) refer to all the statutes, decisions and constitutional provisions relating to schools, or to the Foundation Law only, or otherwise?

"2) By what procedure may the state board of education and the state controlling board determine whether a local board of education 'has not conformed with the law'?

"3) In determining whether good and sufficient reason for non-conformance has been established, to the state board of education and the state controlling board act separately or as a unit?

"4) In making such determination, what, if any, investigative and hearing powers does the state board of education have; what rules of evidence must be followed; and what degree of proof is required?"

As to your first question, a provision is found in existing Section 3317.14, Revised Code, for the withholding of state funds in the case of certain school districts as follows:

"A school district, the board of education of *which has not conformed with the law* and the rules and regulations pursuant thereto, shall not participate in the distribution of funds authorized by sections 3317.02, 3317.04, and 3317.12 of the Revised Code, except for good and sufficient reason established to the satisfaction of the superintendent of public instruction and the state controlling board. * * *" (Emphasis added.)

APPENDIX—Continued

Effective October 1, 1956, an amended provision, analogous to that above, will become effective as follows:

"A school district, the board of education of which *has not conformed with the law* and the rules and regulations pursuant thereto, shall not participate in the distribution of funds authorized by section 3317.02 of the Revised Code, except for good and sufficient reason established to the satisfaction of the state board of education and the state controlling board. * * * " (Emphasis added.)

The use of the article "the" in this statute is suggestive, but only faintly so, of the idea that reference is made to a particular legislative enactment. However, it will be seen that there is not the slightest suggestion in the context of this provision which would aid in identifying any such particular enactment.

Moreover, it is to be observed that the article "the" was inserted in the statute in the course of the 1953 codification, the prior analogous provision in Section 4848–6, General Code, reading as follows:

"A school district, the board of education of which has not conformed with *all the requirements of law* and the rules and regulations pursuant thereto, shall not participate in the distribution of funds authorized by the provisions of sections 4848–1, 4848–3 and 4848–9 of the General Code, except for good and sufficient reason established to the satisfaction of the superintendent of public instruction and the state controlling board; * * *." (Emphasis added.)

It thus becomes clear, because of the legislative purpose, clearly expressed in Section 1.24, Revised Code, not to effect substantive changes in the recodification process, that the provision here in question, to the extent that the point is pertinent, must be read as though the article "the" had not been inserted as an incident of such recodification.

In Cyclopedic Law Dictionary, Third Edition, on the definition of the term "law" it is said:

"A distinction is to be observed in the outset between the abstract and the concrete meaning of the word. In the broadest sense which it bears when used in the abstract law, it is the science which treats of the theory of government.

"In a stricter sense, but still in the abstract, it is the aggregate of those rules and principles enforced and sanctioned by the governing power in a community, and according to which it regulates, limits, and protects the conduct of members of the community. In the abstract sense, it includes the decisions of the courts."

In the same work the use of a prefixed article is mentioned as follows:

"Used without an article prefixed, the abstract sense is generally intended; with an article, the sense is usually concrete."

Applying this rule to the case at hand, and giving consideration to the circumstance that the context in which the term is used in Section 3317.14, Revised Code, gives no hint as to the identity of a particular statute to which reference might be intended, it becomes necessary to conclude that the term "law" as used in that section is used in the abstract meaning of the word.

Because the provision in question relates to the "requirements of law," or conformity therewith, it is clear the term is not here used in such a broad abstract sense as to include the "science which treats of the theory of government," but rather that it is used in the somewhat stricter sense which embraces "the aggregate of those rules and principles enforced and sanctioned by the governing power in a community" and that it "includes the decisions of courts."

Although not set out in your inquiry in express terms, there is latent therein the question of whether the conformity with law provision in Section 3317.14, Revised Code, is sufficient in scope to include instances of segregation of pupils in school according to race.

In the 14th Amendment of the Constitution of the United States there is this provision:

APPENDIX—Continued

" * * * No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In Article VI of the Constitution of the United States there is this provision:

" * * * This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding. * * * "

It is quite clear that these provisions are such as to be comprehended in the term "law" in the sense in which I have indicated such term is used in Section 3317.14, supra, and where there is a denial of "equal protection of the laws" there is an instance of not having "conformed with the requirements of law" or of not having "conformed with the law" as provided in that section.

The equal protection clause above quoted was the subject of consideration in *Brown v. Board of Education*, 347 U.S. 483 [74 S.Ct. 686] 98 L.Ed. 873, the headnotes in the latter report of the decision being in part as follows:

"5. The equal protection clause of the Fourteenth Amendment prohibits the states from maintaining racially segregated public schools, even though the physical facilities and other tangible factors, such as curricula and qualifications and salaries of teachers, may be equal."

In the opinion of the court, delivered by Mr. Chief Justice Warren, there is the following statement:

"We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the ac-tions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment."

This decision is the unanimous pronouncement of the highest court in the land and must be regarded as dispositive of the question of the illegality of racial segregation in the public schools of this state.

It follows, therefore, that in those cases in which your board finds as a matter of fact that racial segregation exists in a particular school district the restrictive provisions of Section 3317.14, Revised Code, must be deemed to apply.

As to the question of your board and the controlling board acting jointly or separately, it is first to be observed that the action of the two boards, in approving distribution of funds notwithstanding a failure to conform with the law, is called for only *after* it is determined that a particular district or board "has not conformed with the law."

Because the state board of education is given the authority and responsibility in Section 3301.07, Revised Code, to "administer and supervise the allocation and distribution of all state and federal funds," and because, in Section 3317.01, Revised Code, it is provided that "Sections 3317.01 to 3317.-15, inclusive, of the Revised Code, *shall be administered by the state board of education*, with the approval of the controlling board," I conclude that the responsibility to ascertain whether in particular cases there is a lack of conformity with law is placed in the first instance with the state board of education.

In this connection, although the controlling board's approval is required in the administration of Sections 3317.01 to 3317.15, Revised Code, it is to be noted that that board's principal function is one in the field of fiscal management and accountability, whereas it is the duty of the state board of education to "administer" the laws relating generally to the operation of the schools, is provided with a departmental staff for the purpose, and is provided with extensive investigative powers as hereinafter pointed out.

APPENDIX—Continued

Accordingly, until such an initial determination is made, the question of joint or separate action, under Section 3317.14, Revised Code, to distribute funds notwithstanding such failure, is purely academic.

I may observe in passing, however, that I perceive no language in the statute which in any way suggests joint action of such boards, and the fact that each is ·a separate entity, separately created by law, would clearly indicate the necessity of separate action.

As to the procedure by which your board may reach a determination as to a failure to conform to the law in particular cases, your attention is invited to the following provision in Section 3301.13, Revised Code:

" * * * In the exercise of any of its functions or powers, including the power to make rules and regulations and to prescribe minimum standards, the department of education and any officer or agency therein, shall be subject to the provisions of chapter 119, of the Revised Code. * * * "

Because one of the functions or powers of the state board of education is to ascertain whether a failure to conform to law has occurred, it is clear that in such a proceeding the provisions of Chapter 119., Revised Code, will apply. Set out in that chapter are detailed procedures for holding hearings, summoning witnesses, receiving evidence, making adjudication orders, and for appeals from such orders by any person "adversely affected."

As to the rules of evidence to be followed and the degree of proof required, your attention is invited to the following provision in Section 119.12, Revised Code:

"The court may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by *reliable, probative, and substantial evidence* and is in accordance with law. In the absence of such a finding, it may reverse, vacate, or modify the order or make such other ruling as is supported by *reliable, probative, and substantial evidence* and is in accordance with law." (Emphasis added.)

Accordingly, in specific answer to your inquiry, it is my opinion that:

1. The term "law" as used in Section 3317.14, Revised Code, forbidding the distribution of state funds to school districts which have not "conformed with the law," is used in the abstract sense and embraces the aggregate of all those rules and principles enforced and sanctioned by the governing power in the community. Such term embraces the equal protection provision in the Fourteenth Amendment of the Constitution of the United States under which the segregation of pupils in schools according to race is forbidden.

2. The primary responsibility for administering the laws relating to the distribution of state and federal funds to the several public school districts is placed with the state board of education, subject to the approval of the state controlling board.

3. It is the responsibility of the state board of education in the first instance to determine whether a particular school district, or the board of education of such district, "has not conformed with the law" so as to require the withholding of state funds from such district. In making such determination the state board of education should observe the requirements of the Administrative Procedure Act, Chapter 119., Revised Code, as to notice, hearing, summoning of witnesses, presentation of evidence, degree of proof, and procedural matters generally.

4. Following a determination by the state board of education that a school district "has not conformed with the law" so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for "good and sufficient reason" established to the satisfaction of each board, order a distribution of funds to such district notwithstanding such lack of conformity with the law.

Respectfully,

C. WILLIAM O'NEILL

Attorney General