Gary L. PENICK, et al. Plaintiffs-Appellees, Cross-Appellants,

v.

COLUMBUS BOARD OF EDUCATION, et al. Defendants,

and

Ohio State Board of Education, et al. Defendants-Appellants, Cross-Appellees.

Nos. 81–3072, 81–3102.

United States Court of Appeals, Sixth Circuit.

Argued June 19, 1981.

Decided Oct. 21, 1981.

Mark O'Neill, Weston, Hurd, Fallon, Pausley & Howley, Cleveland, Ohio, Thomas P. Michael, Alexander, Ebinger, Fisher, Lawrence & McAlister, Samuel H. Porter, Porter, Wright, Morris & Arthur, Columbus, Ohio, for defendants-appellants, cross-appellees.

Leo Ross, Bell, White & Ross, Richard Stein, Columbus, Ohio, William E. Caldwell, Elizabeth McKanna, Ratner & Sugarmon, Memphis, Tenn., Thomas I. Atkins, Teresa Demchak, NAACP, New York City, Solvita A. McMillan, James L. Hardiman, Cleveland, Ohio, for plaintiffs-appellees, cross-appellants.

Before EDWARDS, Chief Judge, LIVELY and ENGEL, Circuit Judges.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

This is the Columbus school desegregation case [1] which has been returned to this court after our remand to the District Court for reconsideration and new findings of fact concerning the question of liability for unconstitutional segregation on the part of defendants-appellants Ohio State Board of Education and Ohio Superintendent of Public Instruction.

---

1. *Penick v. Columbus Board of Education*, 429 F.Supp. 229 (S.D.Ohio 1977), *aff'd in part, vacated and remanded as to state defendants*, 583 F.2d 787 (6th Cir. 1978), *aff'd*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), *opinion on remand*, 519 F.Supp. 925 (S.D.Ohio, 1981).

Our opinion affirmed the District Judge's findings of intentional segregation and liability against the local Board of Education. The District Judge had also found the State Board jointly liable for such intentional segregation. Our remand of this issue reads as follows:

This record does not show any act on the part of the State Board which *required* the Columbus Board to pursue the segregative policies which the District Judge and this court have found. It also does not show any action that the State Board took affirmatively to desegregate the Columbus schools or even to use its statutory powers to investigate and make findings as to whether the Columbus schools were being operated within the law.

The State Board's primary contention on this appeal is that it had no prior knowledge that the segregation existing in the Columbus schools was *unlawful* since it did not know that said segregation was derived from intentionally segregative policies on the part of the Columbus School Board. The State Board also argues that the District Judge did not make findings concerning the "incremental segregative effect" (*Dayton, Bd. of Ed. v. Brinkman, supra*, 433 U.S. 406 at 420, 97 S.Ct. 2766, 53 L.Ed.2d 851) of its actions upon the totality of segregation in Columbus.

While we believe that what we have quoted from the District Judge's opinion must be regarded as a general finding of intentional support of segregation by the State Board, it may well be argued that the *Dayton* opinion requires more detailed findings of fact pertaining to 1) the State Board's knowledge (if any) of the Columbus Board's intentional segregative practices, 2) the State Board's failure to protest or restrain them by withholding funds, 3) the State Board's continuance of support in the face of such knowledge, 4) the motivation of the State Board in failing to investigate the reasons for de facto segregation, and 5) the effect of findings if any, under 1, 2, 3 and 4 above, as suggested in *Dayton, supra* at 420, 97 S.Ct. 2766.

*Penick v. Columbus Board of Education*, 583 F.2d 787, 818 (6th Cir. 1978).

We had also suggested in our remand that there might be need for reopening the record on this issue. On reconsideration, the District Judge did take additional testimony on the questions recited above. He thereupon entered lengthy findings of fact concerning the role which the State Board of Education and its Superintendent played in the years after 1954 when, after *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 all public school authorities had a clear duty to end any intentional segregative practices found in schools for which they were responsible.

**The System-Wide Segregative Practices**

At the outset, we observe that we do not write on a blank slate in this case. Following is the summary of the findings this court made in *Penick v. Columbus Board of Education*, 583 F.2d 787 (6th Cir. 1978), as quoted and approved by Justice White's majority opinion in *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979):

And the Court of Appeals, responding to similar arguments, said:

"School board policies of systemwide application necessarily have systemwide impact. 1) The pre-1954 policy of creating an enclave of five schools intentionally designed for black students and known as 'black' schools, as found by the District Judge, clearly had a 'substantial'—indeed, a systemwide—impact. 2) The post-1954 failure of the Columbus Board to desegregate the school system in spite of many requests and demands to do so, of course, had systemwide impact. 3) So, too, did the Columbus Board's segregative school construction and siting policy as we have detailed it above. 4) So too did its student assignment policy which, as shown above, produced the large majority of racially identifiable schools as of the school year 1975–76. 5) The practice of assigning black teachers and

administrators only or in large majority to black schools likewise represented a systemwide policy of segregation. This policy served until July 1974 to deprive black students of opportunities for contact with and learning from white teachers, and conversely to deprive white students of similar opportunities to meet, know and learn from black teachers. It also served as discriminatory, systemwide racial identification of schools." 583 F.2d at 814. 443 U.S. at 466–467, 99 S.Ct. at 2951.

The District Judge's findings and conclusions on remand included the following:

### State Board Policy

During the years following its creation, the State Board established a policy regarding racial segregation. Although never reduced to writing, it nevertheless is discernible. Unlike its activities in other areas, the Board operated with a few narrow exceptions according to a "hands-off" policy in the area of school desegregation. Rather than using its supervisory powers to inquire into the possibility of law violations and its pursestrings to enforce compliance with the law, the Board developed policies and practices which effectively disabled it from acting at all in this area, thereby avoiding its obligation in the first instance to ferret out constitutional violations with the foreseeable result of maintaining and condoning constitutional violations by local boards. This conclusion is based on the following findings.

From its inception, the Board was aware of litigation involving racial segregation elsewhere in Ohio....

\*   \*   \*   \*   \*   \*

This litigation prompted discussion at an early State Board meeting about the possible existence of illegal racial segregation elsewhere....

\*   \*   \*   \*   \*   \*

In fact, the State Board knew by virtue of the 1956 Attorney General's opinion that it had the authority to investigate for non-conformity with the law and rec-ommend a withholding of funds in the event they found such violations. The Board did not even consider using the sanction of fund withholding until 1978; yet the Board's power to use it remained unchanged over the years. Similarly, the Board has vigorously used its powers to revoke school or district charters over the relevant period for non-compliance with minimum standards.

Yet this power was never exercised to facilitate the dismantling of segregated systems.

The Court concludes that although there were available procedures for the discovery of unlawful segregation in Ohio, and the Board had the authority to remedy it, there was great reluctance to self-initiate any inquiry, and even more reluctance to exercise its power by withholding funding or using other available means as sanctions for a local district's maintenance of unconstitutional racial segregation.

\*   \*   \*   \*   \*   \*

In sum, the officials at the State Department of Education appear to have been as knowledgeable as any agency in the United States on the subject of segregation in public schools. Any assertion that the State defendants believed everything in Columbus was proper since they believed schools were being built in the neighborhood where growth occurred is a meritless over-simplification in light of the facts of this case.

\*   \*   \*   \*   \*   \*

The Court does find that the State Board did, at least upon learning the results of their own 1968 survey, have knowledge of one of the intentional segregative practices of the Columbus defendants. The State Board was aware of the general practice of assigning black teachers only to those schools with substantial black student populations, found by this Court in its 1977 opinion and noted by the Supreme Court on its review. The Board, however, continued to fund and otherwise support the Columbus

District in the face of such knowledge. They did not protest the practice, instead, it persisted until resolved by a consent decree between the Columbus defendants and the Ohio Civil Rights Commission in July 1974. *See Penick v. Columbus Board of Education, supra*, 429 F.Supp. at 238.

The State Board can be charged with knowledge that *de jure* segregation of school children by race was imposed by state law until 1887.

\* \* \* \* \* \*

The State Board's supervisory obligation was spelled out clearly by the Ohio Attorney General's opinion in 1956. Thereafter, any contention that the State Board did not bear the primary, statutory duty, *in the first instance*, to investigate the existence of segregation in the public schools, to ascertain its causes and to use its powers to eradicate it, "root and branch," is without justification.

Instead, the State Board adopted a "hands-off, let someone else do it" approach which amounted to no approach at all. This neutrality overrode the Board's clearly prescribed mandatory affirmative duty as opined by the then Attorney General. . . .

The Board avoided its duty of investigating school segregation by pursuing an unwritten policy of requiring "complaints" rather than initiating its own investigation. This policy of requiring complaints was curiously unique. In no other area of its supervision did the Board require "complaints" prior to investigation.

There is, indeed, no evidence that the State defendants made any effort to self-initiate any investigation into the cause of the racial impaction of any urban school district in Ohio. *See Reed v. Rhodes*, 500 F.Supp. 404 (N.D.1980); *Brinkman v. Gilligan*, 503 F.2d 684 (6th Cir. 1974). While the knowledge that the Court has found on the part of the Board, other than that relating to faculty assignments, does not rise to the level of actual knowledge of intentional segregation practices as described by the Court of Appeals, the Court does find that it rises to such a level that would cause a reasonable person, charged with the same legal duties as are the State defendants, to initiate an investigation into the causes of segregation in the Columbus public schools. This was never done.

\* \* \* \* \* \*

In the Court's view the failure to investigate was another manifestation of the enduring policy of the State Board to let some other governmental agency handle this emotionally-charged issue. This was in clear derogation of the board's obligation under the law.

\* \* \* \* \* \*

If the State defendants had acted within a reasonable time after the receipt of the 1956 Attorney General's opinion, even working at a slow pace, the Columbus schools could have been directed towards and have achieved an appropriate remedy long before this lawsuit was filed. Failure to have done so causes this Court to conclude that the State defendants equally share with the Columbus defendants the responsibility for the system-wide unlawful segregation in the Columbus School District.

*Penick v. Columbus Board of Education*, 519 F.Supp. 925 at 929–942 (S.D.Ohio, 1981) (Citations to trial exhibits omitted.)

We have considered these findings against this record and accept them as not clearly erroneous.

### The "Separate Schools for Colored Children" Reports

This record sheds new light on the state of knowledge of the State defendants— light which was not available earlier. In research conducted preparing this case, plaintiffs found and introduced records showing that for many years after the abolition of Ohio's "black laws" which, until 1887, mandated separated schools for black and white children, the predecessors of the State defendants had accumulated statistics upon the operation of "separate schools for colored children," showing their existence

at least through 1954, the year that *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 was decided. As the District Court carefully recounted, *Penick v. Columbus Board of Education*, 519 F.Supp. at 929–930, the State defendants' predecessors required local school districts to report to the State Department of Education the number of black children attending schools classified as racially separate. The wording of this category suggests that it was designed to inform state educational authorities of how many schools in Ohio were specifically designated for colored children. According to records kept by the defendants, substantial numbers of the state's black children attended such separate schools. A 1929–31 report listed 1,269 Columbus colored children enrolled in "separate schools for colored children." And reports for the 1920's, 1930's, 1940's and 1950's continued to list such separate schools, with the Columbus school authorities reporting four such segregated elementary schools and one junior high school in most of these reports to their state superiors. This information continued to be sought until 1955, after *Brown* found such separate schools unconstitutional, at which time the State Department of Education removed the race-based questions from its reports.[2]

With such reports in hand, it is strange indeed to find the State defendants disavowing knowledge of the segregated conditions of the Columbus black school enclave (consisting, as stated above, of four elementary schools and one junior high school) as found by the District Court, this court, and the Supreme Court of the United States in prior proceedings in this case.

### The "No Knowledge-No Power" Defense

The State defendants insisted that they were unaware of any segregation in schools for which they were ultimately responsible, and that even had they known, they could not have acted on such knowledge.

It is difficult for this court to believe that these defendants could have been as totally ignorant as they now claim. Not only had they been informed by answers to questions they themselves posed (as detailed above), but segregted schools continued to be established in their own back yard. As the District Court found, despite the "abolition of statutory authority for separate schools for black children, the Columbus Board continued to establish new schools that were separate on the basis of race," creating, for example, the Champion Avenue School in 1909 as a separate school for blacks. *Penick* 519 F.Supp. at 929. While it is, of course, true that the State defendants did not have the District Court's findings before 1977, we take notice that the State Board of Education and its Superintendent and staff were and are based in Columbus. They would be unable to avoid knowledge of the segregated conditions recited above which were basic facts of life in Columbus.

The principal defense that the State defendants advance for their failure to act to desegregate the Columbus schools after 1954 is that they had not been put on notice by any court decree that the racial isolation in the Columbus schools was illegal. We reject this argument completely. In 1956, acting on a request of the State defendants' predecessors, the Attorney General of Ohio rendered an opinion which spelled out the law of Ohio concerning race discrimination in Ohio's schools and the duty of the State defendants to act to prohibit such unconstitutional and illegal conditions. The Attorney General's opinion read:

Accordingly, in specific answer to your inquiry, it is my opinion that:

1. The term "law" as used in Section 3317.14, Revised Code [presently codified at Ohio Rev.Code Ann. § 3307.01 (Page Supp.1977)], forbidding the distribution of state funds to school districts which have not "conformed with the law," is used in the abstract sense and embraces the aggregate of all those rules and prin-

---

**2.** The District Court's complete review of the State records on this subject is attached as an Appendix.

ciples enforced and sanctioned by the governing power in the community. Such term embraces the equal protection provision in the Fourteenth Amendment of the Constitution of the United States under which the segregation of pupils in schools according to race is forbidden.

2. The primary responsibility for administering the laws relating to the distribution of state and federal funds to the several public school districts is placed with the state board of education, subject to the approval of the state controlling board.

3. It is the responsibility of the state board of education in the first instance to determine whether a particular school district, or the board of education of such district, "has not conformed with the law" so as to require the withholding of state funds from such district. In making such determination the state board of education should observe the requirements of the Administrative Procedure Act, Chapter 119., Revised Code, as to notice, hearing, summoning of witnesses, presentation of evidence, degree of proof, and procedural matters generally.

4. Following a determination by the state board of education that a school district "has not conformed with the law" so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for "good and sufficient reason" established [sic] to the satisfaction of each board, order a distribution of funds to such district notwithstanding such lack of conformity with the law.

Respectfully,
C. WILLIAM O'NEILL
Attorney General

1956 Op.Atty.Gen. Ohio 514, 520–21.

No instructions could more clearly have defined the defendants' legal duty to require desegregation where intentional segregation exists.

The defendants argue that a complaint to the State Board of Education was a prerequisite to action and that no such complaints came before them. The lack of formal complaint procedure belies this argument as does the fact that several complaints which were brought before them were simply not acted upon. Clearly, the State Board could and can initiate action if necessary, without any complaint before it. *Penick*, 519 F.Supp. at 933–934.

The defendants also argue that the Second Circuit has established precedent which cuts against state liability in this case. See *Arthur v. Nyquist*, 573 F.2d 134 (2nd Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978). After the Second Circuit entered strong findings of intentional racial discrimination against the Buffalo Board of Education, it turned to analysis of similar claims against the New York State Board of Regents. In relation to the state defendants, the Second Circuit found:

The record is significantly different with respect to the state appellants. As early as 1960, the New York State Board of Regents issued a policy statement urging desegregation of New York's public schools. This expression of intent has been reaffirmed on many subsequent occasions.

In 1964, parents of Buffalo schoolchildren appealed to the New York State Commissioner of Education, charging that Buffalo had fixed the attendance zone of a junior high school in such a manner as to make the student population over 90% black. The Commissioner found that *de facto* segregation existed in Buffalo, and ordered the Board of Education to submit an integration plan within three months.[23] The Commissioner subsequently found this plan inadequate, and appointed an Advisory Committee to develop a satisfactory program.

The Buffalo Board of Education approved the proffered program "in principle," but then submitted a plan which the Commissioner found "disappointing and unsatisfactory." Finally, on January 30, 1968, the Board submitted a plan which the Commissioner found acceptable. The Board was then ordered to submit period-

ic reports on the implementation of the program.

This plan, had it been implemented, would likely have reduced racial segregation in the Buffalo schools, but the City's Common Council refused to appropriate funds to implement the Board's plan. In January, 1972, the Commissioner instructed the Board to submit a new desegregation plan; the Board refused to submit such a plan. The Commissioner then sent members of his staff to Buffalo in order to work with the Board in designing a desegregation plan. The Commissioner's staff submitted its recommendations to the Board in November, 1972, but the Board rejected the proposals.

Finally, in January, 1975, following recovery from a heart attack, the Commissioner issued a show cause order to the Buffalo Board of Education in which he threatened to exercise his statutory enforcement powers.

---

[23] *Matter of the Appeal of Yerby Dixon*, 4 Ed.Dept.Rep. 115 (1965).

573 F.2d at 145–146.

From what we have already said above, it is obvious that the Ohio Defendants took no such actions in the *Columbus* case. *Arthur v. Nyquist, supra* is not in conflict with our preceding findings in this case nor with the summary which follows.

### Conclusion

We now turn to the list of findings which were sought in our remand of this case.

As shown above in this record and as found by the District Court:

1. The State Board had direct knowledge of the Columbus Board's intentional school segregative practices.

2. Under the laws of Ohio, the defendant State Board of Education and its Superintendent had "the primary responsibility" for determining whether its school districts (including the Columbus Board of Education) "has conformed with the laws."

3. The State Board never, in relation to Columbus, discharged its legal "responsibility . . . to determine whether a par-

ticular school district or the board of education of such district 'has not conformed to the law' so as to require the withholding of state funds from such districts."

4. To the contrary the record shows that the State Board continued to support the Columbus Board's activities including (among others) financing racially segregated teaching staffs, and segregated schools.

5. The motivation (and the effect) of the State Board on this total record must be held to be the perpetuation of racial segregation.

6. The incremental effect of the State Board's actions and inaction is the total failure of compliance with the constitutions and laws of the United States and of Ohio in the performance of the duty to eliminate racial segregation in the Columbus School system.

The judgment of the District Court is affirmed.