Mark BRINKMAN, et al., Plaintiffs,

v.

John J. GILLIGAN, et al., Defendants.

No. C–3–75–304.

United States District Court,
S.D. Ohio, W.D.

May 24, 1985.

Louis Lucas, Memphis, Tenn., for plaintiffs.

David Greer, Dayton, Ohio, James Ruppert, Franklin, Ohio, Jerry J. Jurca, Columbus, Ohio, for defendants.

## OPINION AND ORDER

CARL B. RUBIN, Chief Judge.

This protracted desegregation case, directed at the Dayton Public School System, was originally filed on April 17, 1972 pursuant to 42 U.S.C. §§ 1983–1988, 2000d (1982), seeking injunctive relief.[1] (Doc. No. 1). The named state defendants, sued in their official capacities, include John Gilligan, former Governor of Ohio and ex officio member of the Board of Education; William Brown, former Ohio Attorney General; Martin Essex, former Superintendent of Public Instruction; the Ohio Department of Education; and the Ohio State Board of Education. (*Id.*; Doc. No. 247 at 4).

The Dayton Board of Education ("Dayton Board") filed a Motion to Require State to Pay a Portion of Costs (doc. no. 104) on December 24, 1975. The memorandum in opposition (doc. no. 113), reply memorandum (doc. no. 114), and supplemental memoranda (doc. nos. 116, 119) were filed. The litigation was later bifurcated, with the first stage limited to the issue of the Dayton Board's liability for the segregation of its school system and the second stage directed at the issue of the state defendants' liability. This Court found that the Dayton Board violated the Equal Protection Clause of the Fourteenth Amendment. *Brinkman v. Gilligan,* No. 72–137 (S.D. Ohio 1973) (doc. no. 59). A systemwide remedy for the segregation was ultimately upheld by the Supreme Court. *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979).

Subsequently, the issue *sub judice* of state liability was revived in June of 1982. (Doc. No. 228). The Dayton Board and state defendants resubmitted memoranda on the issue of state liability. (Doc. Nos. 246, 247). A hearing was held before the Court on January 5, 1983 and the matter taken under submission.

### I. Eleventh Amendment

The plaintiffs sought injunctive relief against the former Ohio Governor, John J. Gilligan; former Attorney General, William J. Brown; former Superintendent of Public Instruction, Martin Essex; the Ohio State Department of Education; and the Ohio State Board of Education.[2] It is the position of the state defendants that two of the five defendants, the Ohio State Board of Education and the Ohio State Department of Education, must be dismissed from the lawsuit on Eleventh Amendment grounds. The Dayton Board has not responded to this assertion. (Doc. No. 246).

The Eleventh Amendment to the Constitution of the United States bars a suit against a state in federal court brought by her own citizens as well as citizens of another state.[3] *Employees v. Missouri Public Health & Welfare Department,* 411 U.S. 279, 280, 93 S.Ct. 1614, 1615, 36 L.Ed.2d 251 (1973). In the absence of consent to a suit in which the state or one of its agencies or departments is named as a defendant, a federal court is barred by the Eleventh Amendment from entertaining the claims. *Pennhurst State*

---

1. For a summary of the litigation's procedural history, *see Brinkman v. Gilligan,* 583 F.2d 243, 245 (6th Cir.1978), *aff'd sub. nom., Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979).

2. The successors in office of the state officials are subject to a claim under 42 U.S.C. § 1983 (1982) for injunctive relief. *Jackson v. Hayakawa,* 682 F.2d 1344, 1351 (9th Cir.1982); *Arthur v. Nyquist,* 573 F.2d 134, 140 (2d Cir.), *cert. denied,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978).

3. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subject of any Foreign State." U.S. CONST. Amend. XI. The Supreme Court, in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), held that the Eleventh Amendment bars a federal court from entertaining a lawsuit brought by a citizen against his own state under federal laws.

*School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). *See Florida Department of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 684, 102 S.Ct. 3304, 3314, 73 L.Ed.2d 1057 (1982); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). This jurisdictional bar applies regardless of the type of relief sought. *Pennhurst,* 104 S.Ct. at 908.

The first issue to be addressed in this case is whether the Ohio State Board of Education and the Ohio State Department of Education can be sued in federal court for violating federal law. The defendants themselves raise the argument that the Court, in *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), implicitly approved the inclusion of the state board in that school desegregation case. A closer examination of the decision reveals that the *Milliken* Court held that the requirement that the state officials pay one-half of the costs resulting from the court-ordered elimination of the segregated condition of the school system fell within the prospective-compliance exception established by *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) and *Edelman,* 415 U.S. at 664, 94 S.Ct. at 1356. *Milliken,* 433 U.S. at 288–290, 97 S.Ct. at 2761–2762.

Even assuming that *Milliken* could be read to stand for the proposition raised by the defendants, the Court notes that the question of whether the Eleventh Amendment requires the dismissal of a state defendant, an issue not directly pressed in *Milliken,* was squarely addressed by the Supreme Court four years later in *Alabama v. Pugh,* 438 U.S. at 781, 98 S.Ct. at 3057. *See Los Angeles Branch NAACP v. Los Angeles Unified School District,* 714 F.2d 946, 950 n. 4 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984). In that case, the plaintiffs sued to enjoin the state of Alabama,

the Alabama Board of Corrections, as well as a number of state officials for violations of the Constitution in a § 1983 action. 438 U.S. at 781, 98 S.Ct. at 3057. The Supreme Court, in a *per curiam* opinion, held that "[t]here can be no doubt ... that the suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit." *Id.* at 782, 98 S.Ct. at 3057. As explained by the *Quern* Court, the case of *Alabama v. Pugh* was so decided because a state cannot even be joined as a defendant in a § 1983 action without violating the Eleventh Amendment. *Quern v. Jordan,* 440 U.S. 332, 339, 99 S.Ct. 1139, 1144, 59 L.Ed.2d 358 (1979).[4] Therefore, we find the issue of whether the Ohio State Board of Education and the Ohio State Department of Education can be sued in this Court for violating federal law is controlled by the *Pugh* decision and any supposition to the contrary has been dispelled by that case.

Likewise, an argument could be made that the United States Court of Appeals for the Sixth Circuit, in *Penick v. Columbus Board of Education,* 663 F.2d 24 (6th Cir. 1981) and *Reed v. Rhodes,* 662 F.2d 1219 (6th Cir.1981), impliedly found no violation of the Eleventh Amendment when, in both cases, the Ohio State Board of Education was made a defendant. It appears, however, that the Court assumed that jurisdiction existed and the issue of the Board's immunity was never directly presented to the Court as a contention of the parties. *See e.g., Penick v. Columbus Board of Education,* 429 F.Supp. 229, 233 (S.D.Ohio 1977), *aff'd,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) ("counsel for the Columbus defendants and for the State of Ohio defendants do not dispute the Court's jurisdiction."). The Sixth Circuit has followed the holding of the *Pugh* decision when "the State of Ohio has squarely raised ... the issue of its sovereign immunity...." *State of Ohio v. Madeline Marie Nursing Homes,* 694 F.2d 449, 457–458 (6th Cir.

---

**4.** The Court in *Quern* also held that 42 U.S.C. § 1983 does not override a state's Eleventh Amendment immunity. *Quern v. Jordan,* 440

U.S. 332, 342, 99 S.Ct. 1139, 1146, 59 L.Ed.2d 358 (1979).

1982). *See also Foulks v. Ohio Department of Rehabilitation and Correction,* 713 F.2d 1229, 1232 (6th Cir.1983) (citing *Pugh* with approval). Because this Court is required to follow constitutional law as defined by the Supreme Court, the decision of *Pugh* is binding precedent. *Cooper v. Aaron,* 358 U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958). *See Pennhurst,* 104 S.Ct. at 918, *citing Hagans v. Lavine,* 415 U.S. 528, 533 n. 5, 94 S.Ct. 1372, 1377 n. 5, 39 L.Ed.2d 577 (1974) ("when questions of jurisdiction have been passed on in prior decisions *sub silentio,* this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us.").

When an action is brought against a state agency, the application of the Eleventh Amendment centers on whether the agency can be characterized as an arm or alter ego of the state, thereby sharing the state's Eleventh Amendment immunity, or whether it can be characterized as a municipal corporation or other political subdivision, which does not partake of the state's immunity. *Hall v. Medical College of Ohio,* 742 F.2d 299, 301 (6th Cir.1984). Although the issue itself turns on federal law, the answer depends, in part, on the nature of the entity created by state law. *Mt. Healthy v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). The term "state" is defined in Ohio Revised Code § 2743.01 (Page 1981) to include "all departments [and] boards ... of the state of Ohio." *Id.* Ohio decisions holding that state universities, state hospitals, and school boards of education are instrumentalities or arms of the state lend sufficiently analogous support to the finding that a state board and a state department are arms of the state. *See e.g., Thacker v. Board of Trustees,* 35 Ohio St. 2d 49, 298 N.E.2d 542 (1973), *overruled in part on other grounds, Schenkolewski v. Cleveland Metroparks System,* 67 Ohio St. 2d 31, 36 n. 4, 426 N.E.2d 784, 787 n. 4 (1981); *Brown v. Board of Education,* 20 Ohio St. 2d 68, 253, N.E.2d 767 (1969). *See also Madeline Marie Nursing Homes,* 694 F.2d at 458; Ohio CONST. art. VI, § 4 (1851); Ohio Rev.Code § 3301.011 *et seq.*

(Page 1981). The Court concludes, therefore, that the Ohio State Board of Education and the Ohio State Department of Education, as arms of the state, are enveloped by the state's Eleventh Amendment immunity.

Finding that this Court has no jurisdiction over the Ohio State Department of Education and the Ohio State Board of Education by virtue of the Eleventh Amendment, the Court hereby DISMISSES the parties from this action. *Pugh,* 438 U.S. at 781, 98 S.Ct. at 3057; *Bailey v. Ohio State University,* 487 F.Supp. 601, 603 (S.D.Ohio 1980). *See Gwinn Area Community Schools v. State of Michigan,* 741 F.2d 840 (6th Cir.1984); *Los Angeles Unified School District,* 714 F.2d at 950. *See also Akron Board of Education v. State Board of Education,* 490 F.2d 1285, 1292 (6th Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974) (dictum).

Although the Ohio State Board of Education and the Ohio State Department of Education have raised an Eleventh Amendment defense, the state officials in this action have not. Nevertheless, "[a] federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment." *Pennhurst,* 104 S.Ct. at 919. Even when a state official rather than the state itself is named as a party, "when the action is in essence one for the recovery of money from the state, the state is the real and substantial party in interest and is entitled to invoke the sovereign immunity from suit even though individual officers are nominal defendants." *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945); *Lee v. Western Reserve Psychiatric Habilitation Center,* 747 F.2d 1062 (6th Cir. 1984). Additionally, the general rule provides that a suit brought by a citizen against a state employee in his official capacity is barred by the Eleventh Amendment regardless of the nature of the relief claimed. *Pennhurst,* 104 S.Ct. at 909.

■ The well-settled exception to these principles, announced in *Ex parte Young,* states that a suit by a citizen challenging the constitutionality of a state official's action is not barred by the Eleventh Amendment. *Banas v. Dempsey,* 742 F.2d 277, 283–84 (6th Cir.1984). The *Edelman* Court interpreted this exception to mean that while the Eleventh Amendment does not bar a suit against a state official for prospective injunctive relief when a federal law violation is alleged, it does bar a suit for retroactive relief and damages when the funds will be paid from the state treasury. *Edelman,* 415 U.S. at 651, 94 S.Ct. at 1347.[5]

■ The suit against the state defendants fits squarely within the *Ex parte Young* exception to the Eleventh Amendment's bar. This case is not one in which a retroactive award of an accrued monetary liability from the state treasury is sought but rather one in which prospective injunctive relief is sought for alleged violations of federal law. *Ex parte Young* and its progeny "clearly permit injunctive relief to compel state officials to comply with federal law, even if the cost of that future compliance requires the expenditure of money by the state." *Banas,* 742 F.2d at 285. *See Milliken,* 433 U.S. at 289, 97 S.Ct. at 2761; *Lee,* 747 F.2d at 1066. Accordingly, the Court has jurisdiction over the state officials named as defendants in this case.

## II. State Defendants' Liability

■ The next inquiry is whether the remaining state defendants [6] have intentionally acted or failed to act thereby causing racial segregation in the Dayton School District. *Penick v. Columbus Board of Education,* 519 F.Supp. 925, 926 (S.D. Ohio), *aff'd,* 663 F.2d 24 (1981). "If a school system was intentionally segregated

at the time of *Brown I* [*v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)], the school officials are under a continuous constitutional obligation to disestablish the dual system as of the date of ... *Brown II* [*v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)]." *Alexander v. Youngstown Board of Education,* 675 F.2d 787, 790 (6th Cir.1982) (citations omitted). Each instance of a failure or refusal to fulfill this affirmative duty to eliminate segregation "root and branch" continues the constitutional violation. *Id.* Knowledge by the state of intentional segregative practices on the part of the local board and intentional support of the local board in pursuing these practices are requirements for finding a constitutional violation. *Reed v. Rhodes,* 607 F.2d 714, 718 (6th Cir.1979), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982).

In reviewing the facts presented to this Court concerning the involvement of the state defendants in the segregation of Dayton schools, we are mindful of the Sixth Circuit's delineation of the findings of fact necessary to establish a constitutional violation. *Reed v. Rhodes,* 662 F.2d at 1221. These findings include:

"(1) the [defendant's] knowledge (if any) of the [local board's] intentional segregative practices,

(2) the [defendant's] failure to protest or restrain them by withholding funds,

(3) the [defendant's] continuance of support in the face of such knowledge,

(4) the motivation of the [defendant] in failing to investigate the reasons for de facto segregation, and

(5) the effect of findings, if any, under 1, 2, 3, and 4 above, as suggested in [*Dayton Board of Education v. Brinkman,*

---

5. The Eleventh Amendment does not bar an action for monetary damages arising from constitutional violations committed by state officials who have been sued in their individual capacities. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). This issue is not germane to our analysis because the defendants have been sued only in their official capacities. (*See* Doc. No. 1).

6. The defendants who remain in this case after the dismissal of the Ohio State Board of Education and the Ohio Department of Education, and referred to hereinafter as the "state defendants," are the Ohio Governor, the Ohio Attorney General, and the Superintendent of Public Instruction of the Ohio Department of Education. (*See* p. 1289 of this Order).

433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) ]."

*Penick v. Columbus Board of Education,* 663 F.2d at 25; *id.* The following discussion incorporates the Court's findings of fact on this constitutional issue.

A. *The State Defendants' Knowledge of Intentional Segregative Practices, Failure to Protest or Restrain Them By Withholding Funds, and Continuance of Support in the Face of Such Knowledge*

The Court's factfinding [7] begins with the historical facts concerning race and public education in Ohio. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265–67, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977). The constitution and laws of the State of Ohio were used to regulate black and mulatto persons during the 1800's. *Reed,* 500 F.Supp. at 407. Black children were totally excluded from public education until 1848; afterward, separate schools for blacks were required by statute. (Dayton Board Exhibit 1). Although in 1887 the Ohio "Black Laws" and provisions for separate black schools were repealed, "previously established districts for black children were not abolished nor was racially integrated education declared to be a policy of the State" of Ohio. 500 F.Supp. at 408. There is no evidence that the state undertook actions during the fifty years following the official repeal in 1887 to dismantle the separate schools. 500 F.Supp. at 408–409; (Dayton Board Exhibit 1).

"Throughout the early 1900's, officials of the State of Ohio were aware that separate schools for black children were maintained in numerous localities. This is reflected in the biennial reports submitted to the Governor of Ohio by the Ohio Director of Education ... from 1929 to 1941.... These reports contained the separate enrollment figures for blacks and whites." 500 F.Supp. at 409. Specifically, from 1912 the Dayton Board continued to operate separate schools for black children until the Ohio Supreme Court affirmed an order requiring the Dayton Board to admit black children to the city schools on equal terms with white children. *Board of Education v. Reese,* 114 Ohio St. 188, 151 N.E. 39 (1926).

"Reports in subsequent years to the Governor and General Assembly demonstrate that separate schools were maintained in some municipalities." 500 F.Supp. at 409. For example, the 1939–41 report noted that although Ohio has very few separate schools for colored children, Dayton was one of the ten cities which reported containing them. *Id.* "Between 1940 and 1954 annual statistical reports were submitted to the State Superintendent of Public Instruction containing data on the racial composition of students and faculty in school districts throughout the state." *Id.* From 1929 to 1954, the "number of colored children and the number of Negro or the number of minor [sic] children were reported to the State Department of Education on an annual statistical report" as well as the number of black teachers and number of separate schools for blacks maintained by the Dayton School System. (Trans. at 92).[8] The State Department of Education also required principals and district superintendents to submit annual statistical reports which included information about the number of black teachers and pupils in each school and about schools for black children. 500 F.Supp. at 409; (Trans. at 10–12). Teachers were required to submit annual reports to the state department reflecting the number of blacks enrolled in their classes. (Trans. at 10–12). The reports between 1940 and 1953 indicate that twenty-six local school districts, including Day-

---

**7.** This Court takes judicial note of the applicable facts litigated in the following cases: *Penick v. Columbus Bd. of Educ.,* 663 F.2d 24 (6th Cir. 1981), *cert. denied,* 455 U.S. 1018 (1982); *Reed v. Rhodes,* 662 F.2d 1219 (6th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); *Penick v. Columbus Bd. of Educ.,* 519 F.Supp. 925 (S.D.Ohio 1981); *Reed v. Rhodes,* 500 F.Supp. 404 (N.D.Ohio 1980).

**8.** The transcript citations from the January 5, 1983 hearing are abbreviated hereafter as "Trans."

ton, had separate schools for black children. 500 F.Supp. at 410.

The Court in *Reed* concluded that separate schools "initially created by state law and enforced by state courts, were maintained by the policies, practices, and customs of local officials." *Id. See Penick,* 519 F.Supp. at 929. "The predecessors of the current state defendants had ample knowledge of the maintenance and establishment of separate schools ... in the state, by virtue of reports required to be made by local school districts to the state department." *Penick,* 519 F.Supp. at 929. (*See* Trans. at 47–48).

In 1954, the United States Supreme Court ruled that the maintenance of separate schools for black and white children is unconstitutional. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed.2d 873 (1954). Consequently, the State Department of Education eliminated questions pertaining to race on its administrative statistical reports from 1954 until 1968. 519 F.Supp. at 930; (Trans. at 112). However, in the local school district's applications for federal funding made in the 1960's, the data provided to the State Board of Education included the racial composition of the student body and faculty. (Trans. at 44).

The Ohio Department of Education came into existence in 1937. 519 F.Supp. at 929. The current State Board of Education ("State Board" or "Board") and Superintendent of Public Instruction were created in 1953 with powers defined in Article VI, § 4 of the Ohio Constitution and Ohio Rev. Code § 3301.011, *et seq. Id.* The State Board exercises general supervisory powers over the Ohio public education system. Ohio Rev.Code § 3301.07. The Board "exercises 'policy forming, planning and evaluative functions for the public schools of the State, leadership in the improvement of public education in Ohio' and 'adminis[ters] the educational policies of this state relat-

ing to public schools.' The Board is further required to 'prepare and submit annually to the governor and general assembly a report on the status, needs and major problems of the public schools of the state of Ohio, with recommendations for necessary legislative action.'" [9] 519 F.Supp. at 930.

The Board prescribes minimum standards for school administration and other factors as the Board finds necessary. Ohio Rev.Code § 3301.07(D). "Since 1966, the State Department of Education has made periodic inspections of various school districts to review compliance with certain legal minimum standards." 519 F.Supp. at 930. The Board must revoke the charter of any district or school that fails to meet the prescribed standards.[10] Ohio Rev.Code § 3301.16. Additionally, the Board administers and supervises the allocation and distribution of all state and federal funds for public education ensuring that the funds are used in accordance with the law. 519 F.Supp. at 930–31. The Board must withhold funds from school districts or schools that are not in compliance with legal requirements, unless for "good and sufficient reason" established to the satisfaction of the State Board and State Controlling Board. Ohio Rev.Code § 3317.01. "[T]he state defendants admitted that, although having the power to do so, they never promulgated minimum standards regarding racial segregation of pupils, faculty, staff, or use of facilities." 500 F.Supp. at 415. "During the years following its creation, the State Board established ... a 'hands-off' policy in the area of school desegregation." 519 F.Supp. at 931.

As a result of the Board's awareness of local segregation litigation ongoing in Ohio since 1955, the opinion of the Attorney General of Ohio was solicited for guidance as to the Board's authority. *Id.* at 931–32. In 1956, the Attorney General of Ohio is-

---

**9.** The State Board exercised its power to recommend legislation freely in the areas of vocational education, teacher certification, funding for disadvantaged pupil programs and other areas not involving desegregation. *Reed,* 500 F.Supp. at 416.

**10.** The State Board had vigorously used its revocation powers for non-compliance with minimum standards. *Id.* at 415.

sued an opinion which described the law of Ohio regarding racial discrimination in its public schools and the duties of the state defendants to act to prohibit such unconstitutional conditions.[11] Although the officials of the State Board knew in 1956 through the Ohio Attorney General's Opinion that the Board had the responsibility to eliminate segregation, they did nothing at that time. (Trans. at 160).

"After receipt of the Opinion of the Attorney General, it was clear to the state defendants that they had the primary responsibility and power to investigate and determine whether local school districts were unlawfully segregated ... [and] that there was an affirmative duty to act to eliminate unlawful segregation after becoming aware of its existence.... However, the state board did not, during the period from 1956 until at least 1968, use its investigative powers to uncover the unlawful segregation of public schools in Columbus or elsewhere." 519 F.Supp. at 932.

In 1965, the Ohio Civil Rights Commission, an agency of Ohio, conducted a survey which revealed a pattern of assigning black teachers to buildings with all or a large percentage of black students. (Dayton Board Exhibits 10, 12). A copy of the analysis and conclusions drawn by the HEW was sent to the Chief Staff School Officer. (*Id.* at 12–16). As early as 1968, the State Board was alerted by HEW to the substantial duality of student assignment patterns present in the Dayton school system. (*Id.* at 12). The Ohio Civil Rights Survey revealed that for the 1963–64 school year, there were 12 Dayton schools with a 91% or more black student population and 22 schools that were all white. (*Id.* at 1). Mr. Bowers of the Ohio Department of Education testified that he was aware of the contents of the HEW Civil Rights Study of 1969. (Trans. at 31, 153–54).

"It was not until 1968 that the State Board began to use its investigatory powers to determine the extent of racial isolation in the schools." 519 F.Supp. at 935. An annual statewide survey of hiring practices and racial balance in all Ohio schools was initiated in 1968, with the first report published in 1970. *Id.* at 936. As a result of the survey, the state defendants knew that as late as 1972–73, 63.3% of all black

---

11. The July 1956 Attorney General's responsive opinion stated:

(1) The term 'law' as used in section 3317.-14, Revised Code [presently codified at Ohio Rev.Code Ann. § 3307.01 (Page 1981) ] forbidding the distribution of state funds to school districts which have not 'conformed with the law,' is used in the abstract sense and embraces the aggregate of all those rules and principles enforced and sanctioned by the governing power in the community. Such term embraces the equal protection provision of the Fourteenth Amendment of the Constitution of the United States under which the *segregation of pupils in schools according to race is forbidden.*

(2) The *primary responsibility for administering the laws* relating to the distribution of state and federal funds to the several public school districts *is placed with the state board of education,* subject to the approval of the state controlling board.

(3) *It is the responsibility of the state board of education in the first instance to determine whether a particular school district, or the board of education of such district, 'has not conformed with the law'* so as to require the withholding of state funds from such district. In making such determination the state board

of education should observe the requirements of the Administrative Procedure Act, Chapter 119, Revised Code, as to notice, hearing, summoning of witnesses, presentation of evidence, degree of proof, and procedural matters generally.

(4) Following a determination by the state board of education that a school district 'has not conformed with the law' so as to require the withholding of state funds as provided in Section 3317.14, Revised Code, such board and the controlling board, acting separately, may, for 'good and sufficient reason' established to the satisfaction of each board, offer a distribution of funds to such district notwithstanding such lack of conformity with the law.

1956 Op.Atty.Gen. Ohio 514, 520–21 (emphasis added). The Attorney General also stated that in the specific area of racial segregation, the fund-withholding provision was mandatory.

It follows, therefore, that in those cases in which your board finds as a matter of fact that racial segregation exists in a particular school district, the restrictive provisions of § 3317.14, Revised Code, must be deemed to apply.

*Penick,* 519 F.Supp. at 932.

elementary teachers were assigned to schools with a 80 to 100% black student bodies whereas no black teachers were assigned to 34 elementary schools with 80 to 100% white student bodies. *Id.* "This form of selection of [teacher] assignments on a racial basis was obviously intentional." *Id.* Additionally, the Dayton district submitted to the Department of Education forms, for the school years of 1968–1977, which indicated the ethnic background of the students in each school within the Dayton District. (Dayton Board Exhibit 1 at 4). Although in May of 1968 policies were adopted to eliminate the segregated teaching staffs (State Board Exhibit U), the State Board did nothing. Staff desegregation in the Dayton system occurred in the fall of 1971 solely as a result of negotiations between HEW and the Dayton Board. (*See* Dayton Board Exhibits 11–15).

In June of 1971, the state defendants were aware that racial isolation and unequal educational opportunities for minority students existed in the Dayton School District. (Dayton Board Exhibit 1 at 8–9; Exhibit 3 at 1, 10, 25). In December of 1971, the Dayton Board passed three resolutions on desegregation.[12] (*Id.* at Exhibit 5). These resolutions were rescinded on January 3, 1972 by a newly constituted local board. (*Id.* at 6). The State Board and the state defendants received notice of both the resolutions and their recission. (*Id.* at 5, 7; Trans. at 66–67, 79; Doc. No. 247 at 24). As Mr. Bowers testified, the recission of the resolutions "started the process of dismantling the affirmative steps that had been taken." (Trans. at 150). No action has been taken by the state defendants as a result of the recission.

There was testimony that close contact between Mr. Greer and the Dayton Superintendent was maintained. (Trans. at 115). The Dayton Board had requested the assistance of the state when Mr. Glatt was sent to study Dayton's condition. In fact, "the State Board knew more about the situation in Dayton than it did in any other

city." (*Id.* at 116–117). Based upon a review of the evidence, the Court concludes that the defendants had knowledge of the Dayton Board's intentional segregative practices.

Turning to the second prong of the analysis, the testimony and evidence indisputably establishes that the state defendants failed to protest the segregation by withholding funds from the Dayton School District. Mr. Oldiges, Associate Director for Budget and Fiscal Management, Dayton Board of Education, testified as follows:

"Q. Was there ever a reduction in state funds to the Dayton Board of Education because of any operation of a segregated system?

A. Never."

(Trans. at 20). This fact was admitted to by all of the state defendants in a Request for Admission:

"42. The State Board never withheld funds from the Dayton School District because it was operating a school or school system in violation of the 14th Amendment of the United States Constitution.

Response: Admit."

(Dayton Board Exhibit 1 at 6).

Dr. Bowers, Assistant Superintendent of Public Instruction, Ohio State Department of Education, stated:

"... the action of Wayne Carle in concert with the State was a series of affirmative acts to reduce the amount of racial isolation within the City of Dayton through a variety of means. And there was no reason for additional state action or, certainly, the withholding of state funds in Dayton, given the progress that was being made in Dayton under the leadership of Wayne Carle, and the Board of Education to reduce the racial isolation."

(Trans. at 117). Mr. Greer, Superintendent of the State Department of Education, noted in a March 20, 1972 letter to Dr. Carle, Superintendent, Dayton City Schools, that

---

**12.** Briefly stated, the resolutions admitted the existence of racial segregation in Dayton and called for an end to it, requested state assistance in developing and funding the desegregation plan, and ordered implementation of its new policy. (Dayton Board Exhibit 5).

"I would not like to be forced into a position calling for a recommendation of withdrawal or withholding of funds." (Dayton Board Exhibit 2 at 2).

It is clear that the State Board, through its employees, was legally required to ascertain the Dayton School System's conformity with the law and cut off state funds if such conformity was lacking. *Reed*, 500 F.Supp. at 421. The statements of Greer and Bower's notwithstanding, the state defendants simply failed to meet their legal obligations in this case. Furthermore, financial support continued to be provided to the Dayton Board in the face of the defendants' knowledge of their intentional segregative acts. (Dayton Board Exhibits 1, 25; Trans. at 20, 34. *See e.g.*, Trans. at 91, 116–18).

### B. Motivation of the State Defendants In Failing to Investigate the Reasons For De Facto Segregation

The State Board and Department of Education, through their employees, have been aware of the existence of many predominently one-race schools in large urban areas in Ohio. *Reed*, 500 F.Supp. at 422. Despite the knowledge of the existence of *de facto* segregation in Ohio, generally, and in Dayton, specifically, the state defendants did not initiate any investigation of the reasons for the segregation prior to 1970. The Dayton Board's Request for Admissions provides the following information:

64. The State Board during the period of 1956 until at least 1968 did not use its investigative powers to investigate unlawful segregation in public schools in the Dayton School District.
Response: Admit.
65. The State Board during the period of 1956 until at least 1970 did not use its investigative powers to investigate unlawful segregation in the public schools within the Dayton School Systems.
Response: Admit.
67. The State Board did not until at least 1970 investigate or undertake to investigate the reasons for racial isolation of students within the Dayton School District.

Response: Admit.
(Dayton Board Exhibit 1). Given the history of state mandated and permitted segregation and the state defendants' knowledge that separate schools had been maintained long after they were officially abolished, an apparent assumption made by the defendants that all segregation was lawful *de facto* segregation was not warranted. *Penick*, 519 F.Supp. at 940; *Reed*, 500 F.Supp. at 423. The 1956 Opinion of the Ohio Attorney General made it clear that it was the state which had the primary statutory obligation to investigate segregation and to eradicate it "root and branch." *Penick*, 519 F.Supp. at 940. As in Columbus and Cleveland, the state defendants' failure to investigate the segregation in Dayton appears to have been motivated by a desire to maintain status quo.

### C. Incremental Segregative Effect

Had the state defendants acknowledged their affirmative obligations under state and federal laws to investigate and eliminate segregation and had the power to withhold state funding been exercised, there is a substantial probability that the Dayton schools would not be in the condition found to exist in 1972. The failure of the state defendants to exercise their obligations promptly under state and federal law was a proximate cause of the plaintiffs' deprivation. *Id.* at 942; 500 F.Supp. at 425.

### III. Conclusion

The Ohio State Department of Education and the Ohio State Board of Education are hereby DISMISSED from this action on Eleventh Amendment grounds. Additionally, the Court finds that the Dayton School District and the remaining state defendants, in their official capacities, are jointly and severally liable for the segregation in existence at the Dayton school district. *See* 500 F.Supp. at 425. Accordingly, IT IS ORDERED that the state defendants share equally with the Dayton Board of Education all expenses incurred to date, as well as future costs as they are incurred, in

remedying the unconstitutional racial segregation in the Dayton school system.

It has been noted that the Summary of Desegregation Costs (doc. no. 228 at Appendix A) is current through December 31, 1981. Consequently, it is further ORDERED that an updated Summary of Desegregation Costs, through December 31, 1984, be provided by the Dayton Board of Education to the Court within 30 days.

IT IS SO ORDERED.